Timothy **COCKRELL**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 71766.

Court of Criminal Appeals of Texas,
En Banc.

Sept. 11, 1996.

Rehearing Denied Nov. 6, 1996.

Julie B. Pollock, Diana L. Hoermann, San Antonio, for appellant.

Edward F. Shaughnessy, III, Margaret M. Fent, Asst. Dist. Attys., San Antonio, Matthew Paul, State's Atty., Austin, for the State.

## OPINION

McCORMICK, Presiding Judge.

The offense is capital murder, and the sentence is death. Appellant raises fifty-four points of error. We affirm.

Viewed in the light most favorable to the verdict, the evidence from guilt-innocence shows appellant was employed by a moving company the victim used on August 7, 1992, to move her belongings into a home the victim had rented. Appellant was involved in this move and he was in the victim's home on August 7, 1992. One of the legs of the victim's table was broken during the move.

On the morning of August 9, 1992, appellant appeared at the victim's home claiming to be there to fix the broken leg of her table. Once inside appellant eventually attacked the victim and strangled her to death. Appellant left the victim in a bathtub full of water where the victim's mother found her later that day. Appellant took various items of the victim's property including her car, a gun, an answering machine and a vacuum cleaner. The police arrested appellant on August 10, 1992, and he confessed later that day.

In point of error five appellant claims the trial court erred in denying his request for a mistrial because of the prosecutor's prejudicial jury argument "striking at appellant over the shoulders of his" lawyers. Appellant claims reversible error occurred when during closing jury arguments at guilt-innocence the State argued appellant's court-appointed lawyers suborned perjury by hiring an expert witness—a Dr. Alexander—to lie to the jury. We set out the portions of the record relevant to our consideration of this point of error.

The testimony from guilt-innocence shows that when the police arrested appellant on August 10th, he was not in possession of any of the victim's property. And, the State had no physical evidence, such as fingerprints, directly connecting appellant to the offense.

However, the State presented evidence that several of appellant's acquaintances were in possession of various items of the victim's property on August 10th. These individuals claimed they received the property from appellant. Appellant, through cross-examination and closing argument, contended these individuals were unworthy of belief because they were "robbers, liars and thieves."[1]

The State pointed out it had to use this evidence because "those are the kinds of people" appellant "hangs out with." In addition to attacking the credibility of this evidence, appellant pointed the finger at others whom the jury might have inferred could have possibly committed this offense. Of course, it was uncontroverted that appellant had been in the victim's home on August 7th.

This brings us to appellant's confession. Appellant, who was 28 years old at the time

---

1. For example, during closing arguments at guilt-innocence, appellant argued:

    "I told you that the State was resting their case on [appellant's confession] because without it they were going to have to depend upon the testimony of robbers, liars and thieves. And here we are."

of the offense, advanced several factual theories on why the jury should not have considered his confession. These theories hinged on appellant's claimed inability to read, write and understand the English language. The charge instructed the jury to disregard appellant's confession if it found the face of the confession did not contain the required statutory warnings or their "substantial equivalent," or if the jury found appellant did not "freely and voluntarily" give the confession "without compulsion or persuasion." [2]

Appellant's confession consists of three pages. The top of each page contains the "substantial equivalent" of the required statutory warnings. See Article 38.22, Section 2(a), V.A.C.C.P. Appellant's signature appears on the bottom of each page. The first page of the confession contains a recital that appellant has a "[t]enth grade education and [he] can read, write and understand the (sic) English." The statements in appellant's confession were consistent with the evidence found at the scene of the offense and with the victim's cause of death.

The State presented the testimony of Detective Saidler who obtained appellant's confession. Saidler testified he had not been assigned to investigate this case. Saidler became involved when Detective Rodriguez, who was the supervising detective of this case, radioed Saidler at his office in the homicide division and told him she wanted his assistance in interrogating appellant who was a suspect in a homicide investigation. Saidler testified he first saw appellant when other officers brought him and several of his acquaintances into the homicide division for questioning.

Appellant and Saidler knew each other from past experiences. Saidler testified that when appellant saw him appellant said he wanted to talk to Saidler. Saidler testified appellant told him that his acquaintances were not involved in any murder.

Saidler testified he took appellant into an interview room and spoke with appellant alone while other officers interrogated appellant's acquaintances. Saidler informed appellant he was under arrest for a parole violation and was also a suspect in a murder. Saidler testified he read appellant the required statutory warnings from a card and asked appellant if he understood these rights. Appellant said he did and signed the back of the card. Saidler testified appellant then started talking "right away."

Saidler testified they talked for two or three hours. During this time, Saidler left the room several times and spoke with other detectives who were investigating the case. Saidler testified on direct and later on cross that these detectives gave him no details about the case.

"Q. Was Detective Rodriguez or the lieutenant coaching you as to what to ask [appellant] or what information, type of information, to get out of him?

"A. No, sir.

"Q. Were they giving you any details of the offense and then telling you, you know, 'Go ask him if he did this, or that, or the other'?

"A. No, sir. They just—they did ask to find out if I had known if he was by himself or not."

Saidler testified that what he knew about the case was what appellant was telling him. Saidler testified appellant orally confessed to the offense.

"Q. Did you have any idea what [appellant] was about to tell you?

---

**2.** We note appellant initially raised this issue in a pretrial motion to suppress his confession which the trial court denied after a hearing. Appellant testified at this hearing. Among other things, he testified he could not read or write and the police never read his confession to him. He claimed he signed the confession without realizing he was confessing to a capital murder.

On cross-examination, appellant admitted that the police read the required statutory warnings to him but he claimed he did not understand them. Later, when the prosecutor read the required statutory warnings to appellant, he testified he understood them. Appellant claimed that he thought he had only been arrested for a parole violation and that he had no idea he was confessing to a capital murder. Appellant also testified he did not tell the police he could not read because they never asked him even though the police asked him to read his confession. Appellant also admitted that he had been in court about thirteen times to plead guilty to various crimes he committed and that he signed various documents in connection with these guilty pleas.

"A.  No, sir.

"Q.  All right.  So how were you able to find out or learn what it was he had to say to you?

"A.  Well, he told it to me.

"Q.  All right.  Now, describe that, how did that work?

"A.  We sat there just talking in general and he told me what had happened out there, his reasons for why it happened and things that happened afterwards, who was involved, who wasn't involved, the fact there was nobody involved.  And we just discussed what, you know, what went on out there.

"Q.  When you are talking about 'out there,' you are talking about in [the victim's] home on the morning of August the 9th, 1992?

"A.  Yes, sir."

Saidler also testified on direct that he showed appellant various pictures of the crime scene and had appellant initial them "to show that they were the pictures" he showed appellant.  Saidler testified he received the pictures from other detectives involved in the case.  Saidler testified these pictures aided him in understanding the information appellant was giving him.

Saidler testified appellant eventually agreed to put his oral statements into writing after Saidler got appellant a cup of coffee.  Saidler called up on his computer screen a standard "confession form."  This form contains, among other things, the statutory warnings on the top of each page.  Saidler testified the first thing he did was determine whether appellant could "read and write and understand English."

"Q.  All right.  Tell us how you then took his oral statements and reduced them to writing on the computer screen?

"A.  Well, the first thing I did is to qualify and talk to him on about how he wanted to word the statement.  The first thing I qualified is whether or not he could read and write and understand English, how much education he had.  And then when he told me, I typed that onto the computer and read it back to him."

Saidler testified he reread the statutory warnings to appellant from the confession form "when" he reduced appellant's oral statements to writing but not "before" he did so.

"Q.  Did you ever reread his rights to him?

"A.  Only when I reduced it to writing.

"Q.  But before you reduced it to writing, you did not reread his rights to him?

"A.  No, sir.

"Q.  Why not?

"A.  He had already been Mirandized.  I am not aware of any ruling where he has to be Mirandized again."

Saidler testified he read portions of appellant's confession to appellant as Saidler typed it.  He testified he read the entire confession to appellant "portion by portion."

"Q.  Okay.  So let me ask you this, did you type the entire confession as a whole or did you do it differently?

"A.  We do it in bits and pieces as we—it's a narrative of what he says.  It's not word-for-word.

"Q.  Okay.  Well, would you type a portion of the statement and then read it back to him or how were you doing that?

"A.  Sometimes I would type it—depending on the size of the paragraph or how much we were talking about, sometimes I would read it back to him as a whole paragraph as I typed along.  Sometimes just a line at a time.

"Q.  Okay.  Why would you change your system in doing that?

"A.  Just depending on how—how much he was talking, how much of it referred to the case, and how just to summarize what he was saying.

"Q.  Regardless of doing it sentence by sentence, paragraph by paragraph, portion by portion, did you read the entire confession to [appellant] as you typed it on the computer screen?

"A.  Not the entire confession just the part I was typing in.

"Q.  Okay.  And what do you mean by that?

"A. Well, the other stuff is preprinted on there. On the screen—the warning rights, the place where witnesses sign, the fill in the blanks type stuff, it's preprinted on the screen. I did not read that back to him.

"Q. Other than the form part of the document that you have testified about, that is the form of the confession—

"A. Yes, sir.

"Q. —did you read back the body of the statement, that is the words that [appellant] spoke to you as you were typing along with the computer screen?

"A. Yes, sir.

"Q. The entire statement?

"A. Not—I mean, when you say entire statement, did I—I did not go back at the end when we get done talking and read from page 1 to page 3, but everything that I typed on as he gave it to me and we talked about it, I read back to him at one time or another while we were doing it.

"Q. All right. Except for the form language?

"A. Yes, sir."

Saidler testified appellant made two corrections to his confession. One of these was to correct the spelling of his name.

Saidler testified he printed the three-page confession and laid the pages out on his desk in front of appellant. He testified he and appellant read them silently. Saidler testified appellant looked like he was reading the confession.

"Q. When [appellant] told you that he had told you all he wanted to tell you, what did you do next?

"A. I printed up the statement I had just taken out on the printer, and I left the room, went and got it and brought it back in and laid the pages out in front of him for him and I to read together.

"Q. Kind of describe to the jury how that occurred. When you say laid out the pages, what do you mean?

"A. It was a three-page statement. I laid the pages out. He was sitting next to the desk. Again, I laid the pages out on the desk 1, 2, and 3, in order and we read over them silently to ourselves.

"Q. Okay. What made you think [appellant] was reading the statement silently along with you?

"A. From the way that he was looking at the paper and he obviously went from one piece of paper to the next.

"Q. What do you mean went from one piece of—

"A. He would look at, you know—like page 1 was there, page 2, page 3. I mean, his head appeared to me as if he was going—the way you look at somebody reading a piece of paper."

Saidler testified appellant signed the bottom of each page after Saidler brought in two witnesses to witness appellant's signatures. Saidler testified appellant indicated no confusion about "what he had just confessed to." Saidler then testified he reread the required statutory warnings to appellant from the top of page one apparently before he began typing the confession.[3]

"Q. By the way, you indicated to the jury at the top of each form includes the enumerated rights that you had already read to him from the Form 66(E) card. Is that the same information that is on top of each of these forms along with the introductory information?

"A. That is—it's not lettered the same way. It's in paragraph form. I don't believe it's word for word as the 66(E).

"Q. Did you choose to reread those enumerations to him on the top of each page?

"A. I did the very first time when I brought it up on the computer screen, to show him what was on there and what I was filling in. I don't recall if I read it—read it to him out loud the next two pages or not when it came up again or if I just told him it was his rights up there again."

---

3. Saidler's direct examination testimony is unclear on this issue. At one point, his testimony seems to indicate he did not reread the statutory warnings to appellant before he reduced appellant's oral statements to writing while the portions of his testimony set out above seem to indicate he did reread the statutory warnings, at least those contained on page one, before he reduced appellant's oral statements to writing.

Saidler eventually read the entire confession to the jury.

On cross-examination, Saidler testified he read appellant the statutory warnings from a card prior to the oral interview and appellant said he understood them.

"Q. All right. And then what did you do then?

"A. I read him his rights off the card. Talked to him, made sure he understood his rights, and when he said he did understand them, I had him sign and date the card."

Saidler also testified that prior to the oral interview with appellant he knew nothing about the offense except that appellant was a homicide suspect and there was a stolen car involved.

"Q. All right. And you told us yesterday, I believe, that you didn't—no one had given you any information about what had happened?

"A. That is correct, sir.

"Q. Nothing at all?

"A. Just that [appellant] was a homicide suspect. And I knew there was a car involved, but I didn't—a stolen car that Kelly Wright [one of appellant's acquaintances] was arrested in, but I didn't have any connection."

Saidler testified he reread the statutory warnings to appellant from the confession form before he began typing appellant's written confession.

"Q. You read it out loud?

"A. Yes, sir.

"Q. No question about that?

"A. No question.

"Q. You are sure?

"A. Yes, sir."

Saidler testified that he read the statutory warnings to appellant from page one of the confession but did not reread them to appellant from pages two and three.

"Q. Yesterday you told us that you maybe only did it on the first page or is that correct?

"A. That is correct.

"Q. You didn't read it aloud on the other two pages?

"A. I don't recall if I did or did not. It's not a habit of mine to read it from every page.

"Q. Are you telling us today as you told us yesterday, that there is no question in your mind you read that out loud?

"A. Yes, sir."

Appellant then confronted Saidler with his testimony from a pretrial hearing on appellant's motion to suppress that he did not read aloud the statutory warnings from page one of the confession.

"Q. Next question was, 'Did you read out loud?'

"A. No, sir.

"Q. Now, that was your testimony back on April 8th. You were under oath that day, isn't that correct, Detective Saidler?

"A. Yes, sir."

Appellant confronted Saidler with more of his prior testimony that he did not read aloud the statutory warnings from page one of the confession.

"Q. Question, 'Silently, I think you said?' What was your answer?

"A. Not all of it. I mean, you asked me if on a particular part on top and I told you that in the part where I filled in, that he was reading with me and then corrected the spelling of his name. That is correct. You asked me if I read every part, no, I did not read him every part.

"Q. Okay.

"A. Read him the warning rights. We read them together. I didn't read them to him verbally."

Saidler claimed he misunderstood appellant's questions from the pretrial hearings.

"Q. I will ask you if you would please, sir—that's all on this point now. But you are telling the jury yesterday and you told them today that you did read that warning to him?

"A. Yes, sir.

"Q. Why is it on two different occasions when you are in this courtroom under oath, Detective Saidler, you specifically said you did not?

"A. Because I believe I misunderstood you when we were discussing it, whether or not I read, misread, or read every three pages to him or the whole entire statement like I did to the jury yesterday. And I never did that. The discussion was on whether or not I read him the entire statement or which portions I read. I cannot be positive on every portion that I read to him. And I never read the entire statement to him like I read to the jury yesterday."

This line of questioning continues for several more pages in the statement of facts, for example:

"Q. Detective Saidler, look back, look back at your answer, starting at line 12. You said to me, 'Not on all of it. I mean, you asked me on a particular part on top and I told you in the part where I filled in that he was reading with me and then corrected the spelling of his name. That is correct.' Your next statement was, 'You asked me if I read him every part.' Your answer—then you said, 'No, I did not read him the warning rights.' Isn't that your language?

"A. Yes, sir, but we are talking about the whole document though at that time. And I told you I did not read him the warning rights on page 2 and 3, I don't believe. There's nowhere in my testimony here and there's nowhere here, whether we are talking about page 2 or 3. In fact, on page 322 we were discussing which page we were talking about. I was asking you, trying to get correct whether it was page 2 or 3 we are talking about or page 1."

Saidler also testified that as he typed appellant's confession and summarized appellant's statements aloud to appellant, he assumed appellant also was reading the statements on the computer screen as Saidler typed them.

"Q. Of course, you told us before that when you took this statement that these— the language here is not the pure language of [appellant]?

"A. That is correct.

"Q. You would ask him something and he would tell you something and you would summarize it?

"A. Yes, sir.

"Q. And when you took it you were satisfied—I believe you told us he was sitting there reading along with you on the computer screen?

"A. Yes, sir.

"Q. As you were typing it?

"A. Yes, sir."

Saidler testified he thought appellant could read since appellant told him that he had a 10th grade education and could "read, write and understand the English."

"Q. And you were under the impression at the time you took it that [appellant] was able to read?

"A. Yes, sir.

"Q. Now, for example, so that we can understand, when you began this statement you started off with 'My name is Timothy Cockrell. I live at 808 Enoch.' And then you typed in, 'I have a 10th grade education and can read, write and understand the English.' That is what you typed there?

"A. Yes, sir, that is what I typed.

"Q. All right. Now, is that—is that what he told you?

"A. No, sir, I asked him. I said—he—I asked him, 'What grade did you go to?' He said, '10th grade.' I said, 'Can you read and write and understand English?' He told me yes, he could. That is the way I typed it in.

"Q. All right. Well, is that what he told you or did you just assume since he went to the 10th grade that he could read and write English?

"A. No sir. I asked him specifically.

"Q. You specifically asked him that and he told you he could?

"A. Yes, sir.

"Q. Did you learn that he actually got as far as about the first six weeks in the 10th grade?

"A. No, sir."

On re-direct examination, Saidler testified appellant never told him he could not read or write.

"Q. Have you ever dealt with persons that you took statements from that in fact could not read or write?

"A. Yes, sir.

"Q. All right. How would you know that?

"A. They would tell me.

"Q. All right. Did [appellant] tell you that he couldn't read or write?

"A. No, sir, he didn't."

Saidler testified that information appellant provided him led to the recovery of the victim's gun.

"Q. Detective Saidler, do you remember the name of the person [appellant] told you he may have sold the gun to that he took out of [the victim's] home?

"A. Yes, sir.

"Q. What was the name he gave you?

"A. He gave the street name of Beastie.

"Q. After the voluntary statement was taken by [appellant], by yourself that is, acting on that information did you begin the search of the handgun that was taken from [the victim's] home?

"A. Yes, sir, I did.

"Q. Okay. And can you tell the jury what you did in your efforts to try to find that gun?

"A. It was the following afternoon, on the 11th, I went out to the Hill area where he said he had met this Beastie and contacted some people and they led me in the direction of a person that was later identified as Marvin Leal.

"Q. And again, please don't tell us what may have been told to you, but did you—when you met up with Mr. Leal did you give him any type of instructions in regards to the gun?

"A. Yes, sir, I did.

"Q. What did you tell him?

"A. To bring it to our office.

"Q. Now, were you involved with the—anything further in regards to the retrieval of the gun once you had the conversation with Mr. Leal?

"A. I took Mr. Leal's written statement when he brought the gun into the office."

Appellant later presented the testimony of Dr. Alexander who was an associate professor of educational psychology appointed by the trial court to test appellant's ability to read, write and comprehend the English language. Alexander first testified about appellant's school records which indicated that during his public school years appellant consistently scored on the lower end of various standardized tests designed to measure various skills. These tests indicated appellant was especially deficient in reading and verbal skills—scoring in the lower 3% of the population. The school records also indicated appellant failed the first and second grades followed by one year of special education. Appellant eventually advanced to the seventh grade even though he consistently made Ds and Fs in "language skills." Appellant was "socially promoted" from the seventh grade which meant his grades were irrelevant.

"Q. So in other words it appears that [appellant] repeated the 7th grade because the previous '76–'77 was the 7th grade?

"A. Yes, sir.

"Q. Now, with English, language arts of F, F, F, what is stamped at the end of that year in terms of whether he was promoted or retained?

"A. It says 'socially promoted.'

"Q. What does that mean to you?

"A. Means the individual was put forward with his age group to the next class or next organized class that he would be in.

"Q. Irrespective of his grades?

"A. Yes."

Appellant eventually advanced to the 10th grade. But, he quit school during his 10th grade year. While in the 10th grade, appellant made "F's across all subjects."

Based on appellant's school records and his scores on the various standardized tests over the years, Alexander characterized appellant's ability to read and write the English language as "disabled."

"Q. All right. Based on your examination of these test scores and [appellant's] school records, how would you characterize—based on these alone, how would you characterize [appellant] with respect to his

ability to read and write the English language?

"A. Disabled.

"Q. All right. What do you mean by that?

"A. Significantly impaired."

Alexander then testified about the various tests he administered to appellant to "test his current ability with respect to his ability to read and write and comprehend the English language." At the time of these tests, appellant was 29 years old. Alexander testified appellant tested at about the level of a first-grader on these tests. One of the reasons Alexander thought appellant tried hard on these tests was based on his observation of appellant's "furrowed brow." Alexander testified that based on these tests appellant is unable to read and write the English language.

"Q. Bottom line, Dr. Alexander, based on your training and experience, based upon your examination and testing of [appellant] and based upon your examination of [appellant's] school records including all the test scores he had, can [appellant] read and write the English language?

"A. He cannot."

Alexander also testified that appellant's confession was "approximately at a 7th grade [reading] difficulty level."

"Q. Were you able to at least approximate a reading difficulty level for [appellant's confession]?

"A. Yes, sir.

"Q. And what—

"A. Using Spache's formula it's approximately at a 7th grade difficulty level.

"Q. All right. How would that compare to [appellant's] reading composite scores?

"A. Well, his reading composite score places him in a grade equivalency level of first grade, third month."

Alexander expressed the opinion that appellant could not read his confession or understand it if someone read it to him even with taking into account that appellant may have corrected a misspelling of his name.

"Q. The—would it make any difference to you if I asked you while this detective or whoever is doing this typing, would it make any difference to you if I said to you that he—that he read [appellant's confession] to [appellant]? Would that make any difference to you, would that change your answer any?

"A. From what I have just testified to?

"Q. Yes, sir.

"A. Whether or not he can read this?

"Q. Yes, could he understand it?

"A. He cannot read and understand that document.

"Q. All right. And the fact that—now, would it change—would it change your opinion any if I further told you that perhaps at some point in the typing or preparation of this statement, the detective misspelled [appellant's] name and [appellant] corrected him, would that change your opinion any?

"A. No.

"Q. Why not?

"A. [Appellant] has been aware of the configuration, the visual form of his name since the first grade or the second grade. He's been seeing it. It's a visual recognition."

Alexander also testified appellant would not have been able to understand the statutory warnings if someone was reading them to him.

"Q. All right. And as I just read it to you, if I read it to [appellant] that way would he understand it?

"A. No."

Finally, Alexander testified appellant's confession was not a "knowing" statement.

On cross-examination, Alexander testified about the "county's" money he received for his "expertise in having tested [appellant] and having reviewed all his records." He further testified he was receiving $90/hour from the county for his in-court time.

"Q. By the way, let's just talk about this up front. You are not doing this gratis, are you?

"A. No, I am not.

"Q. In other words, they are paying you, if not for your testimony certainly for your

time and for your expertise in having tested [appellant] and having reviewed all his records, isn't that right?

"A. The Court is paying me.

"Q. Okay. Well—and that is an interesting point. The bottom line is, regardless of who is paying you, you are getting paid?

"A. That is correct.

"Q. And if you—are you getting paid for your in-court time as well?

"A. Yes, I am.

"Q. Okay. So it is not one of those deals where you get paid a set amount regardless of whether you testify or not? Every time, every hour that you sit here you are getting paid more money?

"A. That is correct.

"Q. Every function that you perform for [appellant] and the [appellant's] attorneys you are getting more money?

"A. I bill certain—I bill certain fees.

"Q. Okay. You are getting more money?

"A. Yes.

"Q. How much have you charged the county so far for your services?

"A. My services and services of the person that I contracted with and helped me do the testing—

"Q. Yes, sir.

"A. —came to a little over a thousand dollars.

"Q. How much?

"A. Total time with—inclusive of testing, consulting with the attorneys, doing the analysis, looking at the material, providing the report, et cetera.

"Q. How much are you charging for your in-court time?

"A. Ninety dollars per hour."

Alexander testified he tested appellant's confession for "readability" even though appellant's lawyers did not ask him to do that.

"Q. Okay. Well, at a point in time before you wrote your report because you wrote in your report, didn't you, that one of the things, one of the functions [appellant's lawyers] asked you to do was to analyze this—this document, the voluntary statement, for readability, isn't that right?

"A. They did not ask me to do that.

"Q. You did that on your own?

"A. Yes, sir."

Alexander testified that illiteracy does not necessarily equate with stupidity or low intelligence.

"Q. If he's—would it be fair to say that disabled in terms of ability to read and write doesn't mean he's stupid, does it?

"A. No, not necessarily.

"Q. And that is the point. We are not—just so it is clear for the jury, we are not equating illiteracy with intelligence, are we?

"A. I am not.

"Q. Illiteracy with intelligence?

"A. I am not.

"Q. But that is the point—

"A. That is, there is not a one-on-one correspondence between the two.

"Q. Someone could be illiterate but highly intelligent?

"A. That is correct."

Alexander also testified the tests he performed on appellant were not designed to test his "street smarts."

"Q. Okay. And that's being able to survive on the street. Okay. Will you agree with me that having street smarts, being able to survive on the street, won't necessarily show up on these tests that you gave [appellant]?

"A. I am not testing that ability, the ability to rob, the ability to buy cocaine, the ability to—what did you say—some of the other activities, I am not testing those abilities.

"Q. But those involve cognitive ability, the ability to think, just as much as these do just in a different capacity, isn't that right?

"A. They do involve ability to make—

"Q. Cognitive choices?

"A. And behavioral choices, yes.

"Q. Choices?

"A. Yes."

Alexander testified he was not telling the jury appellant could not think; he was telling the jury appellant could not read or write.

"Q. So again to be clear, you are not telling this jury that he can't think, you are just telling them he can't read and write?

"A. That is right. I am not telling—

"Q. So—I am sorry. Go ahead.

"A. —that he cannot think. I am saying that his reading, he's disabled in the area of reading and some other related areas. I don't mean to mislead you or the jury about his ability to follow instructions. He in fact had to be directed or reinstructed on some of the tasks over the course of the test."

Alexander reiterated his opinion that he did not believe appellant could comprehend his confession if it was read to him.

"Q. Okay. Are you also saying that he's not capable of comprehending it? Let me ask you, is he capable of comprehending it if it is read to him?

"A. I don't think so."

Alexander further testified there is a difference between the ability to read a statement and the ability to comprehend what is in it. However, he continued to believe appellant did not have the ability "to fully comprehend the content" of his confession.

"Q. Sure does, doesn't it? Doctor, I want to draw a distinction between [appellant's] ability to read that statement and his ability to comprehend what is in it.

"A. Okay.

"Q. Is there a difference between the two?

"A. Yes.

"Q. Okay. One might not be able to read something because they might be illiterate, but if it is read to them they might be able to comprehend it?

"A. That might be the case.

"Q. Okay. But you are saying that's not the case with [appellant], that even if it were read to him he couldn't understand it?

"A. I am saying in my opinion that if this document were read to [appellant], that he does not have the capacity to fully comprehend the content of this document."

Alexander reiterated his opinion that appellant did not have the capacity to comprehend what was in his confession.

"Q. Even given everything you know about him, even if all your assumptions are true, it is possible that if he's the one who told the police that story in the first place, they paraphrased it and read it back to him, that he could understand that, isn't that right? That's what you just told me, isn't it, Doctor?

"A. I don't think [appellant] has the capacity to comprehend what's in this document.

"Q. Doctor, you told me not two seconds ago that this guy possibly could understand that document if he's the one who confessed to it and now you are changing your opinion?

"A. I am sorry. I thought you were talking about a theoretical case. 'What if a person told a story?' I didn't know you meant this literal document.

"Q. Okay. Well, you are not getting paid in a theoretical case, Doctor. You are getting paid by these guys right now."

Alexander then testified appellant was capable of saying and comprehending various words, phrases and sentences that appeared in his confession.

"Q. Let's break it down. Is [appellant] capable of saying and comprehending the words 'I went over to her house'?

"A. I think so.

"Q. Is [appellant] capable of comprehending and uttering the words 'I knocked on her door?'

"A. I think so.

"Q. Is he capable of saying 'She let me in?'

"A. I think so.

"Q. Is he capable of saying 'I fixed a table?'

"A. I think so.

"Q. Is he capable of saying 'I grabbed her?'

"A. I think so.

"Q. Is he capable of saying 'I took her down?'

"A. I think so.

"Q. Is he capable of saying 'I tied her up?'

"A. Yes.

"Q. Is he capable of saying and comprehending 'I tied her mouth?'

"A. Yes.

"Q. Is he capable of saying and comprehending 'I stole her gun?'

"A. Yes.

"Q. Is he capable of saying and comprehending 'I stole her answering machine?'

"A. Yes.

"Q. Is he capable of saying and understanding 'I stole her vacuum cleaner?'

"A. Yes.

"Q. Is he capable of saying and understanding 'I was high on cocaine?'

"A. Yes. Could I interrupt?

"Q. Is he capable of saying and understanding 'I stole her car?'

"A. Yes.

"Q. Is he capable of saying and understanding 'I tried to rent her car?'

"A. Yes.

"Q. Is he capable of saying and understanding 'I sold her gun for $40?'

"A. Yes."

Alexander also testified he was not telling the jury that appellant was not capable of confessing or identifying and initialing pictures of the crime scene.

"Q. By your testimony, you are not telling this jury he's not capable of confessing to it, are you?

"A. No, I am not.

"Q. And in fact, in terms of his confession, on the last page of the confession it talks about his identifying certain pictures, correct?

"A. I don't know. I will have to look.

"Q. Go ahead and read through that, sir.

"A. On the last page?

"Q. Yes, sir.

"A. Yes, I see that.

"Q. In your professional opinion is [appellant], if he really committed this crime, is he capable of looking at a set of photographs from the crime and saying, 'You know, I recognize that as the lady that I was talking about?'

"A. Yes, I do.

"Q. And is he capable, Doctor—let me hand you State's Exhibit No. 81. That is a picture of the victim in this case.

"A. Yes.

"Q. He's capable of recognizing that is a person he killed, isn't he?

"A. I think so."

Finally, Alexander explained that even though he believed appellant could not read his confession or comprehend it if it was read to him, he never read the confession to appellant or asked appellant to read it.

"Q. Doctor, let me ask you this, bottom line, you are saying that he's not capable in the first instance—I am sorry—of having read [appellant's confession]? I will take this from you.

"A. Yes, that is correct.

"Q. Did you ever read it to him?

"A. No, I did not.

"Q. I am sorry, what?

"A. No.

"Q. Let me get this straight. You were hired to determine whether or not he could understand this document and you never read it to him?

"A. I did—I was not hired to determine whether or not he could understand that document. I was hired to assess his language and consequently, his reading ability.

"Q. This document was given to you by the defense lawyers, wasn't it?

"A. Yes, I do have a copy of that, yes, sir.

"Q. One of the things you did was determine on the Fry readability scale whether or not this was a comprehendible document by somebody of [appellant's] intelligence?

"A. I determined a readability level using the Fry readability level, yes.

"Q. But the point is, you made an opinion in your report that says, 'In my opinion he could not have understood this document'?

"A. That is—yes.

"Q. You drew that opinion without ever reading it to him and asking him, 'Hey, do you understand it?'

"A. Yes, I did.

"Q. You didn't give it to him for him to read, correct?

"A. No.

"Q. No, that is not correct?

"A. I did not—I did not give it to him.

"Q. You didn't read it to him, did you?

"A. I did not."

On re-direct examination, Alexander testified he did not test appellant for his IQ.

"Q. Again, you did not measure, you did not test [appellant] for his I.Q.?

"A. I did not."

During closing jury arguments, the State argued Alexander's "ivory tower" opinions were unworthy of belief.

"I want to concentrate, ladies and gentlemen, on what the Defense is hanging its hat on. They are hanging their hat on the testimony of a guy who lives up in an ivory tower at U.T.S.A., a guy who has no earthly concept of what it's like in the real world that you and I live in. He deals with academia. He's got a doctorate. He teaches graduate studies. That is fine. I am not berating him for that, not ragging on him, but that has no application to the world that that man comes from, the world that is now invading our homes.

"That guy had no clue, none. Mentally retarded? My Aunt Fanny. Let's put him out at the New Light Village and see who is mentally retarded. You saw that when he testified. He doesn't know what to do out there. Has no clue how to speak the language, has no idea how to get along in the real world."

Later, the State made essentially the same argument.

"Let's keep going. 'I took those things and I went out and I hid in the country.' Keep in mind that when I am phrasing it this way, what I want you to do is to remember the testimony of their expert. Even he, in spite of the 1500 or 2,000 dollars he's being paid, in spite of the almost 600 bucks he made here for the couple of days of sitting there, even he finally had to admit, 'Yes, he's capable of saying that.'

"In spite of all of this garbage about percentiles and stanines and mildly retarded and severely retarded and gifted and profoundly retarded, in spite of all that garbage, even he finally had to admit, 'Yes, he's capable of freely and voluntarily understanding they (sic) he had a right to remain silent. He had a right to a lawyer. That he had all those rights. He's capable of understanding that."

The State also argued that other police officers were not feeding details of the offense to Saidler because, for example, the police did not know the victim's table had been broken during the move when appellant made that statement to Saidler.

"The question after you determine that there was no compulsion, there was no persuasion—and that is almost a gimmie. After you determine that that is true, that there was no compulsion, no persuasion, you have to determine that this guy opened his mouth and voluntarily uttered the words 'I had a cocaine habit. I moved her in on Friday. I went back to make a little extra money by taking some of her stuff. I knocked on the door and she was there. I went to pretend to fix the table that we had broken in the move.' That is critical. Let's stop right there before we go on.

"That is critical to your determination of whether or not this statement was made up in the mind of George Saidler and Imelda Rodriguez and David Gutierrez and all the other cops. Did they just make that up or did they actually get this statement, this information, freely and voluntarily given?

"Did they get that information from that guy? Yes, they did. How do you know that? Because remember [name of the owner of the moving company that victim used on August 7th]? He didn't give his

statement until the day after this guy confessed. They didn't talk to him until the day after this guy was brought in. Why is that important? Because the only people who could have known that that table was broken during the move were the movers and [the victim].

"George Saidler obviously didn't get that information from [the victim]. The only person he could have gotten it from at the time he was talking to this guy is Timothy Cockrell because [name of owner of moving company] didn't come in until the next day. And I submit to you the reason he came in at all is because of the information they got from him. There's no way Saidler could have known that. So now are you telling me that Saidler made all this up? Common sense. There are some tracks, Mr. Cockrell, you cannot cover."

During his closing arguments, one of appellant's court-appointed lawyers—Armstrong—attacked Saidler's credibility.

"You heard me question Detective Saidler about some prior testimony that he had given concerning the taking of this statement. When he testified here he told you how he read this warning to [appellant], how he actually read him everything as he was typing it. And then when I asked him, 'Well, isn't it a fact, Detective Saidler, when I questioned you in this prior hearing—you remember when I asked you whether you read everything to him you said no, you did not.'

"And it's—I am paraphrasing some of these things. And again please, if I misstate some of the evidence, you remember it the way you remember it. But he said, 'I only read parts of it.' 'Which parts?' 'Well, I don't know.' 'Well, did you read—' in fact, I didn't ask him, 'Well, can you tell us which parts?' And he said, 'Well, I didn't read the warnings.' 'Well, tell us about that. How did that go?' 'We read those silently together.'

"And another time he tells you [appellant] is sitting to his right-hand side and he's reading off the computer screen while he's typing this all up there. But you see, by the time Detective Saidler testified in this trial before you he realized now that we were aware that [appellant] has a deficiency. He can't read. So he had to alter his testimony.

"I think there should be no question in your mind but he altered some of his testimony from the previous time. They would have you believe that he got all of the information that he put in that statement from [appellant]. Well remember, he testified here before you, 'Yes, I had to leave the room a couple of times.'"

Later, appellant's other court-appointed lawyer urged the jury to use Alexander's testimony to conclude appellant could not read or comprehend his confession.

"Is the test that Dr. Alexander gave reliable? Well, it's consistent with the tests that were given by someone else some time ago in school. It's consistent with the grades he made. And you will be able to see those grades here. Why is that important? It is important because [appellant] could not have read this statement either while laying in front of him or he could not have read it off the computer screen. It's beyond his ability. Could not comprehend it."

Later, appellant argued Dr. Alexander was not hired "to test [appellant] on the statement itself" because there would have been "no safeguards there." [4]

"It would not have made any sense at all, as has been suggested, to test [appellant] on the statement itself because there would be no safeguards there. And that isn't why he was hired. He was hired, and the Court approved payment to him, because he is an expert. And he can tell you based on his field of expertise, he can give you, he can tell you in his professional judgment whether or not [appellant] has the intellectual capacity to be able to read and comprehend. And he told you that he could not."

The following emphasized portions of the State's rebuttal arguments are the subjects of appellant's complaints on appeal.

4. We are not exactly sure what this was supposed to have meant.

"[STATE]: If you noticed, when Mr. Armstrong spoke to you *he didn't even get near the confession.* He didn't even talk to you about it. *He was scared to.*

"[APPELLANT]: I object to that. That is a conclusion on his part.

"[STATE]: See?

"[THE COURT]: Sustained.

"[APPELLANT]: He's trying to get—trying to get to the Defendant through striking through his lawyers.

"[THE COURT]: I sustain the objection.

"[APPELLANT]: I ask the jury be instructed as to the comment by the prosecutor.

"[THE COURT]: The jury will be instructed to disregard the last comment by the prosecutor.

"[APPELLANT]: I ask for a mistrial.

"[THE COURT]: That will be denied.

"[STATE]: *I am going to talk to you about the confession. I will talk to you about Dr. Alexander. He was hired for one purpose, ladies and gentlemen. He was hired by those men for one purpose and that was to come in here and take the stand and mislead you and lie to you and tell you that their client did not give that confession. And you should be appalled by that.*

"He never read the confession to [appellant] to see if he could understand it. The easiest, the simplest test to see if he understood what he had told the police he did not do. He did not read it. His testing methods were deplorable. He had a theory and he had to make sure it was proven. And his theory was that [appellant] was illiterate, could not read or write, and therefore, could not give this confession.

"He chose these four tests that would confirm his theory. He failed to choose the one test that would have tested and proven his theory to be wrong. He never read the confession to [appellant]. And if you notice, he was never questioned by [one of appellant's lawyers] about the contents of the confession as to whether or not if he had read it could he have understood it.

"Only when [one of the State's lawyers] asked the doctor, as he read most of the—

a lot of the confession to the doctor, 'Could he have understood these things?' The doctor had to admit, 'Yes, he could have spoken those words. And yes, he would have understand (sic) those words after they had been recorded and read back to him.' 'I went to the lady's house. I went there to fix her table. I went there to steal things. I knocked her down. I choked her.' Come on.

"Why didn't the doctor do that? Because he would not have been able to take that stand and tell you that [appellant] could not understand this confession. *That is deplorable, ladies and gentlemen, to attempt that tactic. And why didn't he do that? Well, is it because he's getting paid to support the theory that they have? I don't know.*

"*Is it because he wanted to shade his testimony? I don't know. Is it because he's a liar? I don't know. Or is it because he's against the death penalty and didn't want to see this man found guilty on the best piece of evidence that would—*

"[APPELLANT]: Excuse me, Mr. Cohen. Judge, I object to this improper argument. This is the guilt stage and the prosecutor is referring to punishment.

"[STATE]: They have raised it in their argument, Judge. Certainly Mr. Armstrong raised it.

"[THE COURT]: All right. I will sustain the objection."

■ Relying on cases such as *Gomez v. State,* 704 S.W.2d 770 (Tex.Cr.App.1985), appellant characterizes the emphasized portions of these arguments as improper personal attacks upon his lawyers because the arguments told the jury that appellant's lawyers had suborned perjury in presenting their case. Appellant further claims these arguments were improper because they "clearly invited the jury to discredit appellant's defense, clearly striking at appellant over his attorney's shoulder." The State responds to appellant's complaint about the first argument by claiming "the remarks of the prosecutor were directed, not at the character of defense counsel, but rather at the argument he had advanced on behalf of his client dur-

ing which time he had conspicuously avoided making reference to the statements the accused had made in his confession." The State argues appellant failed to preserve error with respect to the second and third arguments.

The record reflects appellant preserved error with respect to the first argument since he pursued his objection to an adverse ruling. However, appellant failed to object to the second argument and he received all the relief he requested on his objection to the third argument. In addition, appellant's complaint on appeal about the third argument does not comport with his objection at trial. Appellant, in effect, argues he should be excused from having failed to object properly to the second argument and third argument because the arguments were so prejudicial that an instruction to disregard could not have cured the error in them. This Court has held a defendant may complain for the first time on appeal about an unobjected-to, erroneous jury argument that could not have been cured by an instruction to disregard. See *Romo v. State*, 631 S.W.2d 504, 505 (Tex.Cr.App.1982). This Court also has held a defendant's failure to pursue to an adverse ruling his objection to a jury argument does not constitute a waiver where an instruction to disregard could not have cured the erroneous jury argument. See *Montoya v. State*, 744 S.W.2d 15, 37 (Tex.Cr.App. 1987), cert. denied, 487 U.S. 1227, 108 S.Ct. 2887, 101 L.Ed.2d 921 (1988).

However, these holdings have been undermined by the enactment of Texas Rule of Appellate Procedure 52(a) and this Court's more recent decision in *Marin v. State*, 851 S.W.2d 275 (Tex.Cr.App.1993). In this case, appellant's complaint on appeal is that the prosecutor's second and third arguments exceeded the permissible bounds of jury argument and that the error in these arguments could not have been cured by an instruction to disregard. However, a defendant's "right" not to be subjected to incurable erroneous jury arguments is one of those rights that is forfeited by a failure to insist upon it. See *Marin*, 851 S.W.2d at 279; *Campbell v. State*, 900 S.W.2d 763, 774–777 (Tex.App.—Waco 1995, no pet.) (Thomas, C.J., concur-

ring). Therefore, we hold a defendant's failure to object to a jury argument or a defendant's failure to pursue to an adverse ruling his objection to a jury argument forfeits his right to complain about the argument on appeal. Any prior cases to the contrary such as *Montoya* and *Romo* are expressly overruled. Before a defendant will be permitted to complain on appeal about an erroneous jury argument or that an instruction to disregard could not have cured an erroneous jury argument, he will have to show he objected and pursued his objection to an adverse ruling. Based on the foregoing, we hold appellant forfeited his right to complain about the second and third arguments.

▇ In addition, any error in the arguments was harmless. See Tex.R.App.Proc. 81(b)(2). Any error in the prosecutor's arguments had no impact on the jury "in the light of the existence of the other evidence." See *Orona v. State*, 791 S.W.2d 125, 130 (Tex.Cr. App.1990).

▇ Finally, the jury instruction appellant received on the issue of the voluntariness of his confession was gratuitous. The confession on its face complies with state law. See Article 38.22, Sections 2(a) & (b), V.A.C.C.P. And, there is no evidence in this case of "coercive police activity." See *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986) (coercive police activity is a necessary predicate to the finding that a confession is "involuntary" within the meaning of the Due Process Clause of the Fourteenth Amendment). The record reflects appellant was informed of his rights and "without compulsion or persuasion" he "knowingly" confessed and signed the confession after it appeared he had read it. This is all the Constitution requires. See *Connelly*, 479 U.S. at 167–69, 107 S.Ct. at 522. Therefore, appellant was not entitled to a jury issue on the "voluntariness" of his confession. Appellant's fifth point of error is overruled.

▇ In his first point of error appellant claims the trial court erroneously denied his requested instruction regarding mental impairment as it might affect the voluntariness of his confession. The trial court denied the following instruction that appellant requested

at the close of the guilt-innocence phase of trial.

"You are instructed that, under our law, a statement of a defendant made while he is in the custody of the police or other place of confinement, shall not be admitted in evidence unless it appears that the same was freely and voluntarily made, without compulsion, persuasion, fraud or deception. *Now, if you find from the evidence, or you have a reasonable doubt thereof, that at the time of the statement ... the Defendant was under such a mental impairment as to render his statement not wholly voluntary,* then such statement would not be freely and voluntarily made, and in such case, you will wholly disregard the alleged written statement referred to and not consider it for any purpose nor any evidence obtained as a result of such written statement." (emphasis added).

Appellant does not claim the instruction given was erroneous. He claims the instruction he requested should also have been given. Recently, in *Penry v. State,* 903 S.W.2d 715, 748 (Tex.Cr.App.1995), we held the trial court did not err in refusing to submit a requested jury instruction which was similar to the one appellant requested in this case. In addition, the instruction the trial court submitted to the jury was a correct statement of the law. See *id.* The trial court did not err or abuse its discretion in refusing appellant's requested instruction. See *id.* Moreover, based on our discussion of point of error five, any error in refusing appellant's requested jury instruction was harmless. Point of error one is overruled.

■ Appellant's fourth point of error claims the trial court erred in charging the jury that "so long as the language of the warning used was the substantial equivalent of the language [of the applicable statute] and conveyed the same meaning" the warnings on the face of his confession need not be in the literal language of Article 38.22, Section 2(a). Appellant argues the court's instruction was a comment on the weight of the

evidence.[5] See Article 36.14, V.A.C.C.P. The State claims the instruction was a proper statement of law relating to an issue before the jury.

The issue of whether the face of appellant's confession complied with Article 38.22, Section 2(a), a legal question, and the issue of the voluntariness of appellant's confession, a factual question, were both submitted to the jury. Once the question of facial compliance with Article 38.22, Section 2(a), was placed before the jury, the instruction complained of was a necessary clarification of the law, and not a comment on the weight of the evidence. Moreover, based on our discussion of appellant's fifth point of error, any error in submitting the instruction was harmless. Appellant's fourth point of error is overruled.

■ Appellant's second point of error contends the trial court erred in admitting his confession because the face of it failed to comply with Article 38.22, Sections 2(a)(1) & (2). In pertinent part Article 38.22 states:

"Sec. 2. No written statement made by an accused as a result of custodial interrogation is admissible as evidence against him in any criminal proceedings unless it is shown on the face of the statement that:

"(a) The accused, prior to making the statement, ... received from the person to whom the statement is made a warning that:

"(1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial

"(2) any statement he makes may be used as evidence against him in court; ..."

Each page of appellant's confession contained the following warning:

"I have the right to have a lawyer present, to advise me either prior to any questioning and during any questioning; and that if I am unable to employ a lawyer, I have a right to have a lawyer appointed to counsel with me prior to and during any question-

---

5. At trial appellant raised only this argument, and so, it is the only argument that has been preserved for review and the only argument which we will address. See, e.g., *Burks v. State,*

876 S.W.2d 877, 908 (Tex.Cr.App.1994), cert. denied, —— U.S. ——, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995) (preservation of arguments for appeal).

ing, and that I have the right to remain silent and not make any statement at all; and further, that any statement I make may be used in evidence against me at *trail* [sic] that if I decide to talk with any one, I can, and that I can stop talking to them at any time I want; the above rights are continuing rights which can be urged by me at any stage of the proceedings, and I do hereby voluntarily waive these rights and give to the said [name omitted], the person to whom this statement is being made the following statement." (emphasis added).

Appellant objected that these warnings failed to comply with Article 38.22 because they do not state appellant's statement can be used against him at "trial" or in "court." [6] The warnings on the face of appellant's confession substantially comply with Article 38.22, Sections 2(a)(1) & (2); therefore, the trial court did not err in admitting appellant's confession. See *Sosa v. State,* 769 S.W.2d 909, 916 (Tex.Cr.App.1989). Point of error two is overruled.

■ Appellant's third point of error contends the trial court erred in admitting his confession because it did not comply with the waiver requirements of Article 38.22 Section 2(b). Appellant signed each page of his confession. The face of each page of appellant's confession states, "I do hereby voluntarily waive these rights." Appellant argues this language is insufficient to comply with Article 38.22, Section 2(b), because it does not state on its face an "intelligent, knowing, and voluntary" waiver. We rejected this argument in *Cannon v. State,* 691 S.W.2d 664, 673–74 (Tex.Cr.App.1985), cert. denied, 474 U.S. 1110, 106 S.Ct. 897, 88 L.Ed.2d 931 (1986). Point of error three is overruled.

■ In point of error six, appellant argues the trial court erred when it informed the venire that a defendant convicted of capital murder and sentenced to life would serve a mandatory thirty-five year sentence before becoming eligible for parole. See Article 42.18, Section 8(b)(2), V.A.C.C.P. Similarly, in

points of error forty-one and forty-two appellant alleges the trial court erred when it instructed the jury that a defendant convicted of capital murder and sentenced to life imprisonment would serve a minimum of thirty-five calendar years before becoming eligible for parole. Appellant concedes he "acquiesced" to these instructions. Under these circumstances, appellant waived any error in the trial court's instructions. See *Tucker v. State,* 771 S.W.2d 523, 534 (Tex.Cr. App.1988), cert. denied, 492 U.S. 912, 109 S.Ct. 3230, 106 L.Ed.2d 578 (1989).

■ However, relying on *Marin,* appellant argues the "statutory and constitutional" prohibition against informing a capital jury of the operation of parole laws is such an "absolute" rule of law that it cannot be waived by the parties at trial. We disagree. First, we note the usual scenario in which this issue has arisen is where capital defendants have complained on appeal about a trial court's failure to submit the type of charge appellant "acquiesced" to in this case. See, e.g., *Smith v. State,* 898 S.W.2d 838, 848–53 (Tex.Cr.App. 1995), cert. denied, —— U.S. ——, 116 S.Ct. 131, 133 L.Ed.2d 80 (1995). In any event, this case deals with the "inclusion of a gratuitous special issue" and "not the exclusion of a statutorily required issue." Cf. *Powell v. State,* 897 S.W.2d 307, 315–16 (Tex.Cr.App. 1994). Therefore, we reject appellant's argument that he may now complain on appeal about the inclusion of the parole instructions in the jury charge. Cf. *id.* Points of error six, forty-one and forty-two are overruled.

■ In points of error seven through nineteen, appellant contends the trial court committed reversible error when during voir dire it overruled his objections to the State's assertion that it represents the people of Bexar County, including the victim and her family. Similarly, in points of error twenty through forty, appellant argues the trial court committed reversible error when during voir dire it overruled his objections to the State's improper use of the definition of "criminal acts of violence." The record reflects the veniremembers, who are the sub-

---

**6.** Saidler testified that when he read the statutory warnings from the top of the confession form

to appellant, he read "trial" and not "trail."

jects of these points of error, either did not sit on the jury or were accepted by appellant. With respect to the former group of venire-members, there is no harm. See Tex.R.App. Proc. 81(b)(2). With respect to the latter group of veniremembers, appellant failed to preserve any error. See Tex.R.App.Proc. 52(a). Points of error seven through forty are overruled.

In point forty-three appellant claims the evidence is "constitutionally insufficient" to support the jury's negative answer to the mitigation special issue. See Article 37.071, Section 2(e), V.A.C.C.P. In point forty-four appellant alleges Article 37.071, V.A.C.C.P., is unconstitutional because the mitigation special issue eludes a meaningful sufficiency review of the mitigating evidence. In point forty-five appellant asserts Article 44.251(a), V.A.C.C.P., when interpreted in conjunction with Article 37.071, Section 2(e), is facially unconstitutional under the Eighth and Fourteenth Amendments to the Federal Constitution.

■ We have recently resolved these claims adversely to appellant. See *McFarland v. State,* 928 S.W.2d 482 (Tex.Cr.App. 1996) and at 524–25 (Keller, J., concurring); *Colella v. State,* 915 S.W.2d 834 (Tex.Cr.App. 1995). This Court defers to a jury's finding on the mitigation special issue. See also *Hughes v. State,* 897 S.W.2d 285, 294 (Tex. Cr.App.1994). Points of error forty-three through forty-five are overruled.

■ In point of error forty-six appellant asserts the Due Process Clause of the Fourteenth Amendment to the Federal Constitution requires us to conduct a "comparative proportionality" review of all capital cases. A proportionality review of all capital cases is not required under the Federal Constitution. See *Pulley v. Harris,* 465 U.S. 37, 49–50, 104 S.Ct. 871, 879, 79 L.Ed.2d 29 (1984). Point of error forty-six is overruled.

■ In point of error forty-seven appellant adopts the arguments of Justice Blackmun's dissenting opinion in *Callins v. Collins,* 510 U.S. 1141, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994), to argue that capital punishment is violative of the United States Constitution. This Court does not follow dissenting opinions of United States Supreme Court Justices on federal constitutional issues. Point of error forty-seven is overruled.

■ In points of error forty-eight through fifty appellant claims Texas' capital punishment scheme violates the Eighth and Fourteenth Amendments to United States Constitution. Appellant argues the legislative amendments to Article 37.071 along with the *de facto* amendments created by extra-statutory jury charges added by trial courts have constructed a patch-work quilt of death schemes under which capital murder defendants, even those similarly situated, are disparately treated and arbitrarily and erratically subjected to the death penalty. Appellant claims the mitigation special issue contained in Article 37.071, Section 2(e),[7] renders Texas' capital punishment scheme unconstitutional because it allows untrammeled discretion in imposing the death sentence. See *Penry,* 492 U.S. at 316, 109 S.Ct. at 2945. However, appellant also claims the definition of mitigating evidence contained in Article 37.071, Section 2(f)(4), V.A.C.C.P.,[8] is unconstitutionally too narrow.

With one notable exception, Texas' death penalty scheme substantively is the same as the one the United States Supreme Court upheld in *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). The exception involves Texas' legislative response to the United States Supreme Court's decision in *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Texas'

7. Article 37.071, Section 2(e), as applied here, mandates that upon answering the first special issue affirmatively, the jury determine:

"Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed."

8. Article 37.071, Section 2(f)(4), requires an instruction that each juror:

"shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness."

legislative response to *Penry* mandated the mitigating evidence instruction contained in Article 37.071, Section 2(e). But even with this legislative response to *Penry*, Texas' death penalty scheme continues to narrow the class of "death-eligible" defendants while also providing a jury with more discretion than it had under Texas' prior statutory scheme "to decline to impose the death penalty." See *Penry*, 492 U.S. at 327, 327, 109 S.Ct. at 2945–52, 2951 (" 'in contrast to the carefully defined standards that must narrow a sentencer's discretion to *impose* the death sentence, the Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to *decline to impose* the death sentence' "). (Emphasis in original).

In addition, a majority of the Supreme Court would hold Texas is not constitutionally prohibited from mandating the submission of the mitigation special issue contained in Article 37.071, Section 2(e). Compare *Johnson v. Texas*, 509 U.S. 350, 358–74, 113 S.Ct. 2658, 2664–72, 125 L.Ed.2d 290 (1993) & 509 U.S. at 373–74, 113 S.Ct. at 2672 (Scalia, J., concurring); *Graham v. Collins*, 506 U.S. 461, 467–78, 113 S.Ct. 892, 898–903, 122 L.Ed.2d 260 (1993); *Penry*, 492 U.S. at 358–60, 109 S.Ct. at 2968–69 (Scalia, J., dissenting), *with*, *Johnson*, 509 U.S. at 373–88, 113 S.Ct. at 2672–80 (O'Connor, J., dissenting); *Graham*, 506 U.S. at 500–04, 113 S.Ct. at 915–17 (Stevens, J., dissenting) & at 504–22, 113 S.Ct. at 917–26 (Souter, J., dissenting); but see *Johnson*, 509 U.S. at 373–74, 113 S.Ct. at 2672 (Thomas, J., concurring); *Graham*, 506 U.S. at 477–501, 113 S.Ct. at 903–15 (Thomas, J., concurring). Based on our reading of all the opinions in these cases, it appears the current constitutional rule was stated in Justice Scalia's dissenting opinion in *Penry*, 492 U.S. at 361, 109 S.Ct. at 2969:

"I do not think the Constitution forbids [the giving of the mitigation special issue in Article 37.071, Section 2(e) ] but I am certain it does not require it."

See also *Johnson*, 509 U.S. at 373–74, 113 S.Ct. at 2672 (Scalia, J., concurring); *McFarland*, 928 S.W.2d at 520–21.

Moreover, at least a plurality of the Supreme Court would hold the giving of the definition of mitigating evidence contained in Article 37.071, Section 2(f)(4), in conjunction with the giving of the mitigating evidence special issue contained in Article 37.071, Section 2(e), provides more protection to a defendant than what the Federal Constitution now requires. See *Johnson*, 509 U.S. at 367–69, 113 S.Ct. at 2669 (Federal Constitution does not require that "a jury be able to give effect to mitigating evidence in every conceivable manner in which the evidence might be relevant"); *McFarland*, 928 S.W.2d at 518–519 (holding that Article 37.071's definition of mitigating evidence is not too narrow under the Eighth Amendment); but see *Johnson*, 509 U.S. at 373–74, 113 S.Ct. at 2672 (Thomas, J., concurring); *Graham*, 506 U.S. at 477–501, 113 S.Ct. at 903–15 (Thomas, J., concurring). Article 37.071, Section 2(e), and Article 37.071, Section 2(f)(4), do not render Texas' death penalty scheme facially unconstitutional.

Therefore, consistent with *Jurek* and this Court's more recent decision in *McFarland*, we hold Texas' death penalty scheme is constitutional on its face, and a defendant will have to demonstrate this scheme was unconstitutionally applied to him in order to obtain relief from a death sentence. See also *Penry*, 492 U.S. at 314–16, 109 S.Ct. at 2945. Here, appellant has not shown Texas' death penalty scheme was unconstitutionally applied to him, and we have already decided he may not complain about the "extra-statutory jury charges" in this case. Therefore, we overrule points of error forty-eight through fifty.

In point of error fifty-one appellant claims Article 37.071, Section 2(g), V.A.C.C.P., is unconstitutional because it prohibits informing the jury that a hung jury will result in a life sentence. This Court has resolved this claim adversely to appellant. See *Davis v. State*, 782 S.W.2d 211, 221–22 (Tex.Cr.App. 1989), cert. denied, 495 U.S. 940, 110 S.Ct. 2193, 109 L.Ed.2d 520 (1990). Point of error fifty-one is overruled.

In point of error fifty-two appellant claims the trial court violated Article 37.07, Section 3(c), V.A.C.C.P., by admitting evidence of unadjudicated extraneous offenses during the sentencing phase of his trial. This Court has

held Article 37.071, and not Article 37.07, controls the sentencing phase of a capital murder trial. *Gentry v. State,* 770 S.W.2d 780, 792 (Tex.Cr.App.1988), cert. denied, 490 U.S. 1102, 109 S.Ct. 2458, 104 L.Ed.2d 1013 (1989). Point of error fifty-two is overruled.

In point of error fifty-three appellant claims the admission of evidence of unadjudicated extraneous offenses at the punishment phase of his trial violated due process guarantees of the Federal Constitution. This Court has resolved this claim adversely to appellant. *See Gentry,* 770 S.W.2d at 793. Point of error fifty-three is overruled.

■ In point of error fifty-four appellant relies on various statistical studies to claim Texas death sentences are disproportionately imposed in a racially discriminatory manner in violation of the Eighth and Fourteenth Amendments to the Federal Constitution. We disagree that these statistical studies establish this claim. See *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). In addition, appellant has not established why Texas statutes cannot make *his* conduct subject to the death penalty. And, appellant has not demonstrated that Texas' death penalty scheme was unconstitutionally applied to him. Point of error fifty-four is overruled.

The judgment of the trial court is affirmed.

CLINTON, J., dissents.

MALONEY, Judge, concurring.

The majority overrules appellant's fifth point of error, alleging improper jury argument, on a couple of alternative grounds. I agree with the majority's conclusion that appellant has not preserved error, but write separately to elaborate on that notion.

The majority holds that error was not preserved as to the bulk of the prosecutor's argument due to appellant's failure to object or pursue his objection to an adverse ruling. The majority acknowledges caselaw which holds that a defendant can raise improper jury argument for the first time on appeal if the argument is so prejudicial that an instruction to disregard could not have cured the harm, but concludes that these cases have been undermined by the enactment of

Rule of Appellate Procedure 52(a) and our decision in *Marin v. State,* 851 S.W.2d 275 (Tex.Crim.App.1993). *Majority opinion* at 99. I agree.

In *Marin,* supra, we explained that there are three kinds of "rights" in our system: (1) absolute requirements and prohibitions, (2) rights of litigants that must be implemented unless expressly waived, and (3) rights of litigants that are implemented upon request. The third type of right must be insisted upon at trial, *ergo* Rule 52(a), or nothing is presented for review. *Marin,* 851 S.W.2d at 280. We recently explained forfeitability of rights within our system:

> ... the character of our law is such that the right to complain on appeal about most other trial errors is also contingent upon a specific pretrial or contemporaneous objection.... [The Court of Appeals stated] that legal rights, even those assured by due process, are usually forfeitable by inaction. Clearly, the court was right about this. Because the law ordinarily expects litigants to insist upon their rights at a time when they can be implemented, appellate courts should not consider such rights to have been violated if the beneficiary was willing to forgo them at trial.

*Ieppert v. State,* 908 S.W.2d 217, 219 (Tex. Crim.App.1995).

Examples of error forfeited if not insisted upon at trial include *Batson* error, *Batiste v. State,* 888 S.W.2d 9, 16 n. 5 (Tex.Crim.App. 1994); *Mathews v. State,* 768 S.W.2d 731 (Tex.Crim.App.1989), defects in an indictment, *Fisher v. State,* 887 S.W.2d 49, 54 n. 7 (Tex.Crim.App.1994); *Studer v. State,* 799 S.W.2d 263 (Tex.Crim.App.1990), admission of a confession taken in violation of Fifth Amendment, *Harris v. State,* 827 S.W.2d 949 (Tex.Crim.App.), cert. denied, 506 U.S. 942, 113 S.Ct. 381, 121 L.Ed.2d 292 (1992); *Taylor v. State,* 489 S.W.2d 890 (Tex.Crim.App. 1973), admission of extraneous offense evidence, *Norris v. State,* 902 S.W.2d 428 (Tex. Crim.App.), cert. denied, — U.S. —, 116 S.Ct. 237, 133 L.Ed.2d 165 (1995); *Jacobs v. State,* 787 S.W.2d 397, 406 (Tex.Crim.App.), cert. denied, 498 U.S. 882, 111 S.Ct. 231, 112 L.Ed.2d 185 (1990), and *Witherspoon* error,

*Boulware v. State,* 542 S.W.2d 677, 682–83 (Tex.Crim.App.1976), *cert. denied,* — U.S. —, 116 S.Ct. 237, 133 L.Ed.2d 165 (1977). "Absolute systemic rights" are not subject to Rule 52(a) and do not have to be objected to in order to be raised on appeal. *Marin,* supra. Systemic rights include those that are statutorily or constitutionally mandated, or are otherwise not optional with the parties. *See, e.g., Ex parte Sims,* 868 S.W.2d 803 (Tex.Crim.App.1993)(penal code provision that "sentences shall run concurrently" is absolute requirement and cumulation order to contrary was not authorized by law, even with defendant's consent); *Powell v. State,* 897 S.W.2d 307 (Tex.Crim.App.1994) (legislatively mandated effective date of statute is absolute systemic feature not subject to waiver), *cert. denied,* — U.S. —, 116 S.Ct. 54, 133 L.Ed.2d 19 (1995); *Stine v. State,* 908 S.W.2d 429 (Tex.Crim.App.1995) (constitutional provision requiring judge to conduct proceedings in county seat where case pending is mandatory and nonwaivable); *Ieppert,* supra (constitutional ex post facto prohibition is fundamental systemic requirement that cannot be waived); *Ex parte Hernandez,* 906 S.W.2d 931 (Tex.Crim.App.1995)(constitutional provision that "jury shall be composed of twelve men" is nonwaivable). Absolute, systemic rights are rights that a litigant has no choice about:

> Absolute requirements and prohibitions are independent of the litigants' wishes. *Marin,* 851 S.W.2d at 279. The implementation of these absolute requirements and prohibitions is not optional and is therefore, neither waivable nor forfeitable by any party. *Id.* In *Marin* we noted that the jurisdiction of the courts is the clearest example of such absolute systemic requirements and prohibitions.... Besides juris-

diction, we can think of no less optional a requirement than the "effective date" of a statute.

*Powell,* 897 S.W.2d at 316.

The majority concludes that the right to a trial free from improper jury argument falls within the third category of rights, those that must be insisted upon at trial or are not preserved for review.

Although improper jury argument can sometimes be so prejudicial as to amount to a due process violation, some due process claims can be waived. *Briggs v. State,* 789 S.W.2d 918, 924 (Tex.Crim.App.1990)(defendant waived claim that admission of child video tape violated rights to confrontation and due process by failing to object at trial); *Rogers v. State,* 640 S.W.2d 248 (Tex.Crim. App.1982)(op. on second motion for reh'g)(lack of objection on due process grounds to failure to hold probation revocation hearing waived error); *see also Ieppert,* supra (acknowledging that due process rights can be waived). While improper jury argument is offensive and can be devastating to a defendant's case, it is no less optional than other types of error that may be equally devastating but must be objected to, such as the wrongful admission of extraneous offense evidence or the admission of a coerced confession.[1] Prior caselaw that focuses on the curability of the harm in determining whether it is subject to procedural default rather than the type of right at issue does not square with *Marin.* Accordingly, I agree with the majority that improper jury argument is subject to contemporaneous objection under Rule 52(a) in order to preserve error for appeal.

I would also observe that the prior exception to the contemporaneous objection rule

---

1. As Chief Justice Thomas, of the Tenth District Court of Appeals has observed,

    Incurable harm does not arise only from improper jury argument. A defendant is often irreparably harmed by the improper introduction, without any objection, of evidence relating to extraneous offenses. He might get a reversal, but it would have to be on the basis of ineffective assistance of counsel, not on the basis of fundamental error resulting from the improper introduction of evidence.

*Campbell v. State,* 900 S.W.2d 763, 775 (Tex. App.—Waco 1995)(Thomas, C.J., concurring). He further noted the odd dichotomy that exists under prior caselaw in that the improper introduction of extraneous offense evidence is subject to procedural default, but a prosecutor's improper reference to an extraneous offense during argument, if proven to be incurably harmful, is not subject thereto. *Id.*

has little or no reasoned basis. The exception has generally been stated as follows:

> The general rule is that any impropriety in the prosecutorial argument is waived by a defendant's failure to make a proper and timely objection. [citation omitted] *An exception exists where the prosecutor's argument is so prejudicial that an instruction to disregard will not cure the harm.*

*E.g., Briddle v. State,* 742 S.W.2d 379, 389 (Tex.Crim.App.1987), *cert. denied,* 488 U.S. 986, 109 S.Ct. 543, 102 L.Ed.2d 573 (1988). In attempting to trace this exception to its source, it became apparent that the cases cited as authority therefor do not support it.[2] Moreover, the exception has never been applied by this Court. That is, in all of the cases stating the exception or purporting to apply it, there was either an initial objection to the argument (although the objection might not have been followed through to an adverse ruling)[3] or the Court concluded that the argument was not so prejudicial that an instruction to disregard could not have cured

it. I could not locate a case reversed for improper jury argument *where no initial objection was made to the argument.*[4]

There is a related exception set forth in prior caselaw—if a defendant objects to an improper jury argument and requests a mistrial, but does not request an instruction to disregard, error will not be deemed waived if the argument was so prejudicial that an instruction to disregard would not have cured it. *See Johnson v. State,* 611 S.W.2d 649, 650–51 (Tex.Crim.App.1981); *Montoya v. State,* 744 S.W.2d 15 (Tex.Crim.App.1987)(op. on reh'g), *cert. denied,* 487 U.S. 1227, 108 S.Ct. 2887, 101 L.Ed.2d 921 (1988). The importance of requesting an instruction to disregard logically depends upon whether the error could have been cured by such instruction. *Montoya,* 744 S.W.2d at 37. If the argument is so inflammatory that an instruction to disregard would not cure it, then "the only request that would possibly yield relief [is] a motion for mistrial;" therefore, failure to request an instruction is of no moment.

2. For instance, *Romo v. State,* 631 S.W.2d 504 (Tex.Crim.App.1982), one of the cases expressly overruled by the majority, is often cited as authority for the exception. In *Romo v. State,* the exception is stated but not applied because the Court concluded that the argument there was not so prejudicial that an instruction to disregard could not have cured it. *Romo* cites *Plunkett v. State,* 580 S.W.2d 815 (Tex.Crim.App.1979)(op. on reh'g), *Smith v. State,* 541 S.W.2d 831 (Tex.Crim.App.1976)(op. on reh'g), *cert. denied,* 430 U.S. 937, 97 S.Ct. 1565, 51 L.Ed.2d 783 (1977), and *Rodriquez v. State,* 530 S.W.2d 944 (Tex.Crim.App.1975), as authority for the exception. *Plunkett* states the exception but does not apply it, apparently concluding that the argument was not so prejudicial that it could not have been cured by an instruction to disregard. *Plunkett* cites *Smith* and *Rodriquez* as authority. Neither *Smith* nor *Rodriquez* even refer to any such exception; both cases simply hold that no objection was made to the allegedly improper argument and therefore nothing was presented for review.

3. In two cases that were reversed for improper jury argument, there was an initial objection, although it appears that no adverse ruling was obtained. In *Lewis v. State,* 529 S.W.2d 533 (Tex.Crim.App.1975), the defendant objected to the prosecutor's argument, but it is not clear from the opinion whether the objection was sustained or overruled. We reversed the case based on the improper argument, citing *Bray* for the proposition that an instruction to disregard would not have removed the prejudice. In *Bray v. State,* 478 S.W.2d 89 (Tex.Crim.App.1972), the

defendant objected to the jury argument, but it does not appear from the opinion that he obtained a ruling on his objection. The Court said that "[u]nder the circumstances of this case the error was sufficiently preserved for review" and that the argument called for a reversal. The Court further stated that "[i]f it could be argued that the error was not properly preserved, we conclude that an instruction to disregard would not have sufficed to have removed the prejudice."

A later case discussing *Lewis* and *Bray* interpreted those cases as "resulting in reversal despite the fact that the objections were not properly preserved, the court holding that an instruction to disregard would not have cured the prejudicial effect of the statement." *Briddle,* 742 S.W.2d at 389.

4. In the absence of an objection, reversal on appeal essentially means that the trial court should have *sua sponte* ordered a mistrial. This Court has recognized that in such circumstances, retrial could be barred by double jeopardy. *Stiggers v. State,* 506 S.W.2d 609, 612 (Tex.Crim.App.1974)(recognizing that where defendant did not request instruction to disregard or motion for mistrial, if court had declared mistrial sua sponte further prosecution would have been barred by former jeopardy); *Grant v. State,* 472 S.W.2d 531, 533 (Tex.Crim.App. 1971)(if court had granted mistrial on own motion, re-trial might have been prevented under jeopardy principles).

*Id.* It is not clear whether the majority dispenses with this "exception" as well as the one discussed above. This "exception" should be maintained. Rule 52(a) requires a timely objection stating the grounds therefor and asking for the desired ruling.[5] When an objection is made, followed by a motion for mistrial in the case of argument that is so inflammatory that an instruction to disregard would be of no value, Rule 52(a) has been satisfied.

With these comments, I concur in the disposition of appellant's fifth point of error and otherwise join the opinion.

MEYERS, J., joins.

MANSFIELD, Judge, concurring.

I join the opinion of the Court, but I write separately to address some of the concerns raised by the concurring and dissenting opinions with respect to appellant's fifth point of error. In that point of error, appellant contends the trial court erred in denying his request for a mistrial on the ground the State's jury argument impermissibly attacked appellant over the shoulders of counsel by impugning counsel.

Ronald Alexander, an associate professor of education at the University of Texas at San Antonio, testified at trial for appellant. Alexander testified as to his examination of appellant and as to several tests he administered to appellant to measure his intelligence, reading skills, and comprehension skills. He testified further it was his opinion appellant could not read or understand the written confession he had signed and which was admitted at trial. During cross-examination, the State elicited an admission from Alexander that he had not asked appellant to read his confession, nor did he conduct any examination of appellant to determine if he understood or comprehended what his confession meant or what significance it had.

At final argument, the prosecutor told the jury: "If you noticed, when Mr. Alexander spoke to you he didn't even get near the confession. He didn't even talk to you about it. He was scared to."

Counsel for appellant objected to the prosecutor's comment as being conclusory and as being an impermissible attempt to get to appellant by striking at him through his lawyers. The trial court sustained the objection and instructed the jury to disregard the comment by the prosecutor. Appellant's request for a mistrial was denied.

We have held that, to constitute proper jury argument, the argument must encompass one or more of the following: (1) summation of the evidence presented at trial, (2) reasonable deduction from that evidence, (3) answer to opposing counsel's argument, or (4) a plea for law enforcement. *McFarland v. State,* 845 S.W.2d 824, 844 (Tex.Crim.App. 1992), cert. denied, 508 U.S. 963, 113 S.Ct. 2937, 124 L.Ed.2d 686 (1993); *Gaddis v. State,* 753 S.W.2d 396 (Tex.Crim.App.1988). Jury arguments must be extreme or manifestly improper, or inject new and harmful facts into evidence, to constitute reversible error. *Gaddis, supra,* at 398.

The prosecutor's comment here, in my opinion, is not an example of the kind of jury argument that was so prejudicial that the trial court's instruction to disregard was not sufficient to cure it. The prosecutor did not inject new and harmful facts into evidence, nor did he expressly or implicitly accuse defense counsel of lying, suborning perjury, or manufacturing evidence, the kind of arguments this Court has properly condemned. *See Johnson v. State,* 611 S.W.2d 649 (Tex. Crim.App.1981); *Montoya v. State,* 744 S.W.2d 15 (Tex.Crim.App.1987) (op. on reh'g), cert. denied, 487 U.S. 1227, 108 S.Ct. 2887, 101 L.Ed.2d 921 (1988). Accordingly, the trial court's instruction to the jury to disregard *this portion* of the State's argument cured any error.

---

5. Rule of Appellate Procedure 52(a) provides in part that:
   In order to preserve a complaint for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling he desired the court to make if the specific grounds were not apparent from the context. It is also necessary for the complaining party to obtain a ruling upon the party's request, objection or motion.

However, appellant directs us to *another portion* of the State's argument which I find considerably more troubling. After the trial court instructed the jury to disregard the portion of the State's argument discussed above, the State made the following argument:

I am going to talk to you about the confession. I will talk to you about Dr. Alexander. He was hired for one purpose, ladies and gentlemen. He was hired by those men for one purpose and that was to come in here and take the stand and mislead you and lie to you and tell you that their client did not give that confession. And you should be appalled by that.... He never read the confession to [appellant].... Why didn't the doctor do that? Because he would not have been able to take that stand and tell you that [appellant] could not understand this confession. That is deplorable, ladies and gentlemen, to attempt that tactic. And why didn't he do that? Well, is it because he's getting paid to support the theory that they have? I don't know. Is it because he wanted to shade his testimony? I don't know. Or is it because he is against the death penalty and didn't want to see this man found guilty on the best piece of evidence that would [convict him]?

Appellant objected to this argument as improper, objecting that "this is the guilt stage and the prosecutor is referring to punishment." Appellant did not object to this argument as an improper attack on appellant over the shoulders of counsel. The trial court sustained the objection. Appellant did not ask for a timely instruction to the jury to disregard the argument.

The above argument by the State does, to some extent, accuse counsel for appellant of putting Alexander on the stand to lie and to mislead the jury. Such argument is clearly improper and, arguably, falls under the exception recognized in *Romo v. State*, 631 S.W.2d 504 (Tex.Crim.App.1982) (neither a contemporaneous objection nor a timely request for an instruction to disregard is necessary to preserve error with respect to prosecutorial argument so manifestly prejudicial

that an instruction to disregard would not have cured the harm).

Texas Rule of Appellate Procedure 52(a) provides: "In order to preserve a complaint for appellate review, a party must have presented to the court a timely request, objection or motion, stating the specific grounds for the ruling he desired the court to make if the specific grounds were not apparent from the context...." As appellant did not offer at trial a timely objection on the ground now raised to the portion of the argument at issue on appeal, Rule 52(a), on its face, appears to preclude him from doing so on appeal.

The right to a trial free of improper jury argument is not a systemic or constitutional right not subject to waiver. Systemic or constitutional rights not subject to waiver include: the effective date of a statute, *Powell v. State*, 897 S.W.2d 307 (Tex.Crim.App. 1994); constitutional provision regarding where trial proceedings must be conducted, *Stine v. State*, 908 S.W.2d 429 (Tex.Crim. App.1995); and composition of the jury, *Ex parte Hernandez*, 906 S.W.2d 931 (Tex.Crim. App.1995). We have held that systemic or constitutional rights such as those described above are not subject to Rule 52(a) and, even in the absence of a timely objection at trial, may be raised for the first time on appeal. *Marin v. State*, 851 S.W.2d 275 (Tex.Crim. App.1993). Such rights are independent of the wishes of the parties and, as such, may not be waived. *Marin, supra*, at 279.

An improper jury argument is a classic example of a trial error that is peculiar to the trial in which it occurs. Unlike the constitutional requirement that a jury be comprised of twelve persons, *Ex parte Hernandez, supra*, a violation of which implicates the entire criminal justice system, it is hard to posit that an improper jury argument has any effect beyond the trial in which it occurred.

Accordingly, I agree with the dissent that the jury argument with respect to Alexander was improper and prejudicial. However, because appellant failed to offer a proper and timely objection, he failed to preserve error and is precluded by Rule 52(a) and *Marin, supra*, from raising the argument on appeal. To the extent that they conflict with Rule

52(a), I agree that *Romo* and its progeny have been overruled.

With these comments, I join the opinion of the Court.

BAIRD, Judge, dissenting.

The fifth point of error contends portions of the State's closing argument at the guilt-innocence phase of the trial were improper comments which struck at appellant over the shoulder of trial counsel.[1] The portion complained of in the State's argument focused on defense witness, Dr. Ronnie Alexander, an associate professor of educational psychology, who testified appellant was unable to comprehend his confession due to his first grade reading level. The State accused both Dr. Alexander and defense counsel of purposefully lying about appellant's illiteracy and education level in an effort to reduce the credibility of appellant's confession. Appellant specifically complains of the following jury argument:

> STATE: If you noticed, when [defense counsel] spoke to you he didn't even get near the confession. He didn't even talk to you about it. He was scared to.
>
> DEFENSE: I object to that. That is a conclusion on his part.
>
> STATE: See?
>
> TRIAL JUDGE: Sustained.
>
> DEFENSE: He's trying to get trying to get to the Defendant through striking through his lawyers.
>
> TRIAL JUDGE: I sustain the objection.
>
> DEFENSE: I ask the jury be instructed as to the comment by the prosecutor.
>
> TRIAL JUDGE: The jury will be instructed to disregard the last comment by the prosecutor.
>
> DEFENSE: I ask for a mistrial.
>
> TRIAL JUDGE: That will be denied.
>
> STATE: I am going to talk to you about the confession. I will talk to you about Dr. Alexander. He was hired for one purpose, ladies and gentlemen. *He was hired by those men for one purpose and that was to come in here and take the stand and mislead you and lie to you and tell you that their client did not give that confession. And you should be appalled by that.*
>
> \*   \*   \*   \*   \*   \*
>
> He never read the confession to [appellant]. And if you notice, he was never questioned by [defense counsel] about the contents of the confession as to whether or not if he had read it could he have understood it.
>
> \*   \*   \*   \*   \*   \*
>
> Why didn't the doctor do that? Because he would not have been able to take that stand and tell you that the [appellant] could not understand this confession. That is deplorable, ladies and gentlemen, to attempt that tactic. And why didn't he do that? Well, is it because he's getting paid to support the theory that they have? I don't know.
>
> Is it because he wanted to shade his testimony? I don't know. *Is it because he's a liar?* I don't know. Or is it because he's against the death penalty and didn't want to see this man found guilty on the best piece of evidence that would . . .
>
> DEFENSE: Excuse me. Judge, I object to this improper argument. This is the guilt stage and the prosecutor is referring to punishment.
>
> STATE: They have raised it in their argument, Judge. Certainly [defense counsel] raised it.
>
> TRIAL JUDGE: All right. I will sustain the objection.

### I.

The majority holds appellant forfeited his right to complain about the argument on appeal because there was no contemporaneous objection at trial. The contemporaneous objection rule is found in Tex.R.App. P. 52(a) which provides:

Preservation of Appellate Complaints

(a) In order to preserve a complaint for appellate review, a party must have pre-

---

1. Appellant's point of error reads:
   The trial court erred in denying appellant's request for mistrial because of the prejudicial jury argument of the prosecution attacking defense counsel thus striking at appellant over the shoulders of his attorney.

sented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling he desired the court to make if the specific grounds were not apparent from the context. . . .

Rule 52(a) was promulgated to codify the existing case law which prescribed the manner for preserving error.

Prior to promulgation of Rule 52(a), we operated under the general rule that any impropriety in the prosecutorial argument was waived by a defendant's failure to make a proper and timely objection. *Briddle v. State*, 742 S.W.2d 379, 389 (Tex.Cr.App.1987). However, an exception was recognized where the prosecutor's argument was so prejudicial that an instruction to disregard would not cure the harm. *Romo v. State*, 631 S.W.2d 504 (Tex.Cr.App.1982), and cases cited therein. *See also, Motley v. State*, 773 S.W.2d 283, 293 (Tex.Cr.App.1989). The exception was necessary because extreme arguments create a circumstance where it is impossible to withdraw the impression produced in the jurors' mind. *Rodriguez v. State*, 646 S.W.2d 539, 542–543 (Tex.App.—Houston [1st Dist.] 1982). Consequently, neither an objection nor an instruction to disregard were necessary to preserve error.

The majority cites *Marin v. State*, 851 S.W.2d 275 (Tex.Cr.App.1993), to suggest that rule 52(a) modified or "undermined" this longstanding exception. *Ante*, at 89. The majority states:

> However, a defendant's "right" not to be subjected to incurable erroneous jury arguments is one of those rights that is forfeited by a failure to insist upon it. *See, Marin*, 851 S.W.2d at 279. . . .

*Ante*, at 89.

This reasoning represents a misstatement of the holding in *Marin*, where we specifically stated: "Rule 52(a) was meant to reaffirm these basic principles of adversary litigation, not to amend or repeal them." *Marin*, 851 S.W.2d at 280. Neither rule 52(a) nor *Marin*, modify the basic principles that guaran-

tee a defendant a fair trial. Rather both must be read to include situations where the error is so egregious no instruction will cure the harm. Under this reading the exception to the contemporaneous objection requirement survived the promulgation of rule 52(a). Indeed, we recognized its continued viability in *Harris v. State*, 827 S.W.2d 949, 963 (Tex. Cr.App.1992).[2] The majority errs to hold otherwise.

## II.

Recognizing the continued existence of the exception, we must now determine whether the State's jury argument was improper and if so whether it was of such a prejudicial nature as to fit within the exception.

Jury argument must be confined to four permissible areas: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) an answer to the argument of opposing counsel; or (4) a plea for law enforcement. *Campbell v. State*, 610 S.W.2d 754, 756 (Tex.Cr.App.1980); *and, Alejandro v. State*, 493 S.W.2d 230, 231 (Tex.Cr.App. 1973). The instant State's jury argument does not fall within any of the four areas of permissible jury argument. *See, Campbell*, 610 S.W.2d at 756.

Appellate courts should not hesitate to reverse when it appears the State has departed from one of these areas in argument and has engaged in conduct calculated to deny an accused a fair and impartial trial. *Johnson v. State*, 604 S.W.2d 128, 135 (Tex.Cr.App. 1980). The test to determine whether an improper argument constitutes reversible error is whether: (1) the argument is violative of a statute or, (2) it injects a new and harmful fact into the case, or (3) it is manifestly improper, harmful and prejudicial to the rights of the accused. *Thompson v. State*, 480 S.W.2d 624, 630 (Tex.Crim.App. 1972); *Briddle*, 742 S.W.2d at 389–390 (quoting *Todd v. State*, 598 S.W.2d 286, 297 (Tex. Cr.App.1980)).

**2.** Specifically, the *Harris* Court stated:
   If the prosecutor strays outside these areas, the defendant, to preserve error, must object until receiving an adverse ruling. *An exception to this contemporaneous objection requirement*

*exists when the prosecutor's argument is so prejudicial that an instruction to disregard the argument could not cure the harm. . . .*
*Harris*, 827 S.W.2d at 963 [emphasis added].

For many years this Court has recognized prosecutor's arguments which personally attack defense counsel are manifestly improper because they serve to inflame the minds of the jury to the accused's prejudice. In *Jones v. State*, 151 Tex.Crim. 115, 205 S.W.2d 590 (1947), the State, in closing argument, accused defense counsel of manufacturing evidence. The State argued:

> I have heard of Dusty Miller [defense counsel] for many years. When I first came to this country I heard of men that Dusty Miller had cleared of murder by the machinations of a great mind and a shrewd mind. My dear fellow, you needn't have worried one minute *because Dusty Miller will take care of everything and furnish the evidence. ...*

*Jones*, 205 S.W.2d at 592. Even though the trial judge sustained the objection and instructed the jury not to consider the argument, this Court ordered a reversal.

In *Bray v. State*, 478 S.W.2d 89 (Tex.Cr. App.1972), the prosecutor argued:

> ... We represent the people here in this County. That's who are employer is and suffice it to say Ladies and Gentlemen I am grateful and I shall be *eternally grateful that you are the people that are my employers and not the likes of him and that I am not representing this sort of thing.* Rest assured I am very happy about that. I am grateful that I don't have to make my living that way.

*Bray*, 478 S.W.2d at 89. This Court found the argument to be so extreme as to require a reversal because an instruction to disregard the State's prejudicial argument would not have sufficed to have removed the prejudice. *Id.* at 90. *See also, Summers v. State*, 147 Tex.Crim. 519, 182 S.W.2d 720 (1944).

In *Fuentes v. State*, 664 S.W.2d 333 (Tex. Cr.App.1984), we held the State made an improper remark as to the moral character of defense counsel. The State, objecting to the cross-examination by defense counsel, stated:

> Oh Judge, we object to that, he is in bad faith like usual and we object to it. That is a bunch of garbage and he knows it.

*Fuentes*, 664 S.W.2d at 335 (emphasis in original). The trial judge sustained the State's objection and denied defense counsel's objection to the above remark made by the State. "It is axiomatic that the State may not strike at a defendant over the shoulders of his counsel or accuse defense counsel of bad faith and insincerity." *Ibid.* We held the "prosecutor's comment was manifestly improper, harmful, and prejudicial, thus constituting reversible error." *Id.* at 337.

In *Bell v. State*, 614 S.W.2d 122 (Tex.Cr.App.1981)(panel op.), the State during jury argument at the guilt/innocence phase of the trial argued:

> Defense counsel is a criminal defense lawyer. He doesn't have the same duty I do. He represents the criminal. *His duty is to see that his client gets off even if it means putting on witnesses who are lying.*

*Bell*, 614 S.W.2d at 123. The Court held the prosecutor was striking at the defendant over the shoulder of counsel in an attempt to prejudice the jury against appellant. *Ibid.* The Court further held the trial judge's instruction to disregard the argument was not sufficient to have removed the prejudice it created. *Ibid.*

Finally, in *Gomez v. State*, 704 S.W.2d 770 (Tex.Cr.App.1985), this Court again reversed a case where the State used an improper jury argument. The State argued:

> ... *We are not paid to satisfy [defense counsel], or anyone else that he drags down here from Lubbock to manufacture evidence.* And you are not—...

*Gomez*, 704 S.W.2d at 771 (emphasis in original). Defense counsel's objection was sustained and the jury was instructed to disregard the comment. The State immediately began its argument on the same point:

> It was designed to make you not lose sight of the fact that [defense counsel] is paid to get this defendant off the hook. And if you can't get him off the hook, get him a little lesser included offense of some kind.... That's what he is paid for. Don't forget that.

*Ibid.* The trial judge overruled defense objections. We held: "[t]his Court has shown a special concern for final arguments that con-

stitute uninvited and unsubstantiated accusation of improper conduct directed at a defendant's attorney." *Ibid.* The Court was unanimous in its conclusion that reversal was required because the cumulative effect of the two arguments was to deny the defendant a fair and impartial trial. *Id.* at 773.

### III.

The instant argument is in the league of those set forth above. It was so prejudicial that it meets the exception to the contemporaneous objection requirement of Rule 52(a) because an instruction to disregard would not have cured the harm. *Romo v. State,* 631 S.W.2d 504 (Tex.Cr.App.1982). Similarly, the argument was manifestly improper, harmful, and prejudicial, thus constituting reversible error. *Fuentes,* 664 S.W.2d at 337. Accordingly, I would sustain the fifth point of error and reverse the judgment of the trial court. Because the majority does not, I respectfully dissent.

OVERSTREET, J., joins this opinion.