# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00048-CR

**Charlie Deherrera III, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF LLANO COUNTY, 33RD JUDICIAL DISTRICT
### NO. CR5696, HONORABLE GUILFORD L. JONES, III, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant Charlie Deherrera, III, guilty of burglary of a habitation with intent to commit sexual assault and assessed his punishment at eleven years' imprisonment.[1] *See* Tex. Penal Code Ann. § 30.02 (West 2003). Appellant asserts that the evidence is legally and factually insufficient to sustain the jury's verdict of guilt. He also contends that the trial court erred by overruling his motion to suppress evidence, the prosecutor engaged in improper jury argument, and his trial counsel rendered ineffective assistance. We will overrule these contentions and affirm the conviction.

---

[1] The district court's judgment shows appellant's name as "Deherra." All other documents in the clerk's record, the reporter's record, and both briefs state that appellant's name is "Deherrera." We will modify the judgment accordingly.

## BACKGROUND

The complainant was employed as a waitress at a Kingsland restaurant owned by appellant's sister and where appellant worked as cook. The complainant testified that on the afternoon of March 4, 2005, she was sitting outside the rear door of the restaurant, taking a break after the lunch rush, when she was joined by appellant. As they chatted, appellant asked the complainant what she did for fun. The complainant told him that she had a five-year-old daughter who kept her busy. She also mentioned that she relaxed by sitting in her hot tub. Nothing more of interest was said, and the complainant soon returned to work.

That afternoon, as the complainant was leaving work at the end of her shift, she encountered appellant and several other employees who were standing outside the restaurant. As she walked past this group on the way to her car, appellant called out, "[W]hat time is the hot tub party?" The complainant replied that she was going to sit in her hot tub "right now" and kept walking. Appellant caught up with her and asked, "[C]an we really come over and sit in the hot tub?" The complainant told appellant that she really did not know her plans, but she gave him her telephone number and told him to call her later.

The complainant said that she bought a six pack of beer on the way home. At about 7:30 p.m., after confirming that her daughter was spending the night with a school mate and after a conversation with Joe Parker, a close friend who lived in the garage apartment behind the complainant's house, she put on her bathing suit, got in the hot tub, and began drinking a beer. Soon, her phone rang. The caller was appellant, who asked her, "[C]an we come over?" The complainant, who was certain that appellant used the plural "we," replied, "[Y]eah, you know, for

2

a little while." Then she gave appellant directions to her house. Appellant arrived a short time later with an ice chest full of beer. The complainant testified that she was surprised to see that he was alone. Appellant, who was wearing swimming trunks, soon joined the complainant in the hot tub. The complainant testified that for the next few hours, she and appellant sat on opposite sides of the hot tub, drinking beer and conversing.

Parker testified that he left the garage apartment at about 7:00 that evening. When he left, the complainant was alone in the hot tub. When he returned at about 9:30, the complainant and appellant were sitting in the tub together, on opposite sides. The complainant invited Parker to join them in the tub. Parker declined the offer, but sat down beside the tub and chatted with the complainant and appellant for about thirty minutes. Parker then went to his apartment, but he later returned to the complainant's residence to take a shower and do laundry. Parker, who acknowledged that he is a recovering alcoholic, testified that he "was a little concerned about the amount of consumption over there" and "kept an eye on the situation" over the course of the evening. Parker, who could see the hot tub from his apartment, said that he did not notice any romantic activity between the complainant and appellant. Parker testified that before going to bed at approximately midnight, he noticed that appellant's vehicle was gone.

The complainant testified that at some point in the evening, appellant told her that she "looked sexy." She told him that she was not interested in anything but friendship. A few minutes later, appellant "moved his foot or something and it touched mine and so I turned sideways and he was like, you're jumpy." The complainant said that appellant told her, "[I]f y'all just try it [with] a young man, you might like it," and, "[W]e don't have to have a relationship, we can just have

3

sex." Finally, after appellant continued to "come on" to her despite her rebuffs, the complainant got out of the hot tub and ordered appellant to leave. Appellant did so, taking his ice chest with him. The complainant estimated that it was about midnight when appellant left. After calling to check on her daughter and smoking a last cigarette, the complainant went to bed at about 1:00 a.m.

The complainant testified that she awoke to find appellant in bed with her. He had removed her pajama bottoms and underwear and penetrated her with his penis before she became fully awake and aware of his presence. She described appellant as smelling of alcohol and cigarettes. She began to struggle and demand that he stop, and he did so. The complainant testified, "He put his—something on, clothes. It was very quick. He said, I'm sorry. And I just said, get out of here. I'm calling the police, get out of here and he was gone."

The complainant immediately called Parker and told him what had happened. Parker testified that the call came at about 5:00 a.m. He said that the complainant was "crying and trying to speak at the same time," and was hard to understand. Finally, the complainant told him, "He raped me." Parker went to the complainant's house, where she told him that appellant had returned to her house during the night and gotten in bed with her. Parker urged the complainant to go to the hospital. The complainant agreed and after dressing, the two drove to the hospital in Llano without calling the police. The complainant estimated that they arrived at the hospital at 5:30 a.m. When she told hospital staff that she had been sexually assaulted, they contacted the local crisis center and the sheriff's office. The crisis center, in turn, arranged for the complainant to be examined by Sheri Nevins, a sexual assault nurse examiner.

4

Nevins testified that the complainant was tearful and unable to relax during the course of her examination. The complainant told Nevins, "I woke up with him raping me, Chuck. I woke up to him inside of me on top of me, his penis inside of my vagina."

Llano County Sheriff's Deputy Aimee Overstreet was in charge of the investigation of this offense. After interviewing the complainant at the hospital, Overstreet obtained warrants to arrest appellant and to seize biological samples. Overstreet testified that she was anxious to obtain the samples before appellant could take a shower, so she and other officers immediately went to appellant's Kingsland residence to execute the warrants. Overstreet described appellant as "very upset" following his arrest. As he sat in the back seat of Overstreet's patrol car on the way to Llano, appellant "scream[ed], yell[ed], curs[ed]" and "denied having done anything with the victim." Overstreet testified that appellant also made a number of volunteered statements: that he had gone to the complainant's house to sit in the hot tub; that the complainant rubbed his legs, sat in his lap, and tried to kiss him; that after leaving the hot tub, he and the complainant sat on the couch in her living room; that he left the complainant's house to go to a nightclub; and that "he should have had sex with [the complainant] and then maybe she would have not filed sexual assault charges on him." Overstreet testified that she attempted to record appellant as he made these statements, but her in-car videotape recorder malfunctioned.

Overstreet took appellant to the Llano hospital, where the biological samples were taken by Nevins. Nevins testified that when she first encountered appellant at the hospital, he was "screaming, and hollering, and cussing," and that he crudely denied assaulting the complainant.

Pursuant to the search warrant, Nevins swabbed appellant's penis and took samples of his blood, saliva, and hair for DNA testing. In addition, appellant voluntarily gave the police the

5

piercing ring in his penis. A mixture of the complainant's DNA and appellant's DNA was found on the swab and ring. A similar mixture of DNA was found on a wrist watch that was lying on the floor of the complainant's bedroom; there was no dispute at trial that the watch was appellant's. No semen was found on the complainant's underwear or on vaginal swabs taken during her physical examination, and no DNA testing was performed on these items. DNA tests were also not performed on stains observed on the complainant's bed sheets.

Appellant testified that on the afternoon in question, the complainant approached him outside the restaurant and invited him to a hot tub party at her house. She told him that others had been invited and suggested that he bring some beer. When he arrived at the complainant's house, she was already sitting in the hot tub. Appellant said that he took off his shirt and wrist watch, leaving them beside the hot tub, and joined the complainant. Appellant testified that as he sat in the tub, the complainant "started rubbing her feet on my legs underneath the water, and so I started rubbing my feet on her legs and she eventually kind of floated and turned around and sat next to me and started holding my hand." They began to kiss, and their hands "were pretty much wandering around." Appellant said that the complainant quickly moved away from him when she heard Parker approaching, but she moved back beside him when Parker left. They resumed kissing and touching each other.

According to appellant, he and the complainant eventually got out of the hot tub and went inside her house. They sat on the living room couch and began to kiss. They continued to fondle each other, and they soon began to rub each other's genitals beneath their swimming suits. When the complainant began to remove appellant's swimming trunks, he stopped her and told her that he "didn't have any protection, that we couldn't go any further." He said that she told him not

6

to worry, that she was no longer able to have children. He told her that he was more concerned with safe sex. Appellant said that the complainant became angry, and he left her house a short time later to join some friends at a local nightclub. Appellant insisted that the only rooms he entered in the complainant's house were the living room and the bathroom and that he never entered her bedroom.

Appellant testified that he remained at the nightclub until shortly before 2:00 a.m. After leaving the club, he and a friend went next door to a barbeque stand. At 2:30 a.m., appellant made a call to the complainant's residence and left a message on her answering machine. The complainant testified that she slept through the call and discovered the message after she returned home from the hospital. In the message, appellant apologized to the complainant and said that he respected her. Appellant testified that the purpose of the call was to tell the complainant that his reluctance to have unprotected sex that night was not based on any fear that she might have a sexually transmitted disease. Appellant denied that he was apologizing to the complainant for having "come on" to her.

After leaving the barbeque stand, appellant and his friend went on to a private party where appellant drank heavily. According to appellant, he became so intoxicated that he remembers little of what happened after arriving at the party. The friend testified that someone at the party drove appellant home in his vehicle at about 4:30 that morning. Appellant said that his next memory was being awakened by the officers who came to his house to serve the arrest and search warrants.

Appellant insisted that he did not return to the complainant's house after leaving it to go to the nightclub. He said that he never entered the complainant's bedroom, and he denied having sexual intercourse with her.

7

## SUFFICIENCY OF EVIDENCE

Appellant contends that the evidence is legally and factually insufficient to sustain the verdict of guilt. The question presented is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (legal sufficiency); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (legal sufficiency); *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000) (factual sufficiency). In a legal-sufficiency review, all the evidence is reviewed in the light most favorable to the verdict; it is assumed that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Clayton*, 234 S.W.3d at 778. In a factual-sufficiency review, all the evidence is considered equally, including the testimony of defense witnesses and the existence of alternative hypotheses. *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996); *Orona v. State*, 836 S.W.2d 319, 321 (Tex. App.—Austin 1992, no pet.). The evidence will be deemed factually insufficient if the evidence supporting the verdict is so weak as to make the finding of guilt clearly wrong or manifestly unjust, or if the verdict is against the great weight and preponderance of the available evidence. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006); *Johnson*, 23 S.W.3d at 11.

In support of his contention that the evidence is legally insufficient, appellant urges that the physical evidence and other undisputed facts are as consistent with his innocence as with his guilt. He asserts that the jury "had to make unwarranted leaps in logic" to find him guilty. To the contrary, however, the jury had to weigh the disputed evidence and determine the relative credibility of the complainant and appellant. We must assume that the jury believed the complainant's testimony, which is sufficient to support a finding beyond a reasonable doubt that appellant entered

8

the complainant's residence without her consent and with the intent to commit sexual assault. We find the evidence legally sufficient to support the verdict and overrule issue two.

Appellant makes a similar argument in urging that the evidence is factually insufficient. He urges that the DNA evidence does not establish his guilt and attributes the presence of the complainant's DNA on his penis to their sex play on the couch. He testified that he took off his wrist watch before getting into the hot tub and argues that the complainant later moved it into the bedroom in order to incriminate him. Citing the testimony that he was too drunk to drive when he left the party, appellant urges that he could not have managed to drive to the complainant's house later that morning. He challenges the credibility of the complainant's story, particularly her claim that appellant removed her clothing and penetrated her before she awoke.

In a factual-sufficiency review, the reviewing court must give due deference to the fact finder's determinations, particularly those concerning the weight and credibility of the evidence, and it may disagree with the result only to prevent a manifest injustice. *Johnson*, 23 S.W.3d at 9; *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). Viewing all the evidence neutrally, including the conflicting accounts given by the complainant and appellant and the testimony of the various other witnesses who confirmed one or the other, we conclude that the evidence supporting the verdict is not so weak as to make the finding of guilt clearly wrong or manifestly unjust, and that the verdict is not against the great weight and preponderance of the available evidence. Finding no manifest injustice in the finding of guilt, we overrule issue three.

**MOTION TO SUPPRESS**

Appellant moved to suppress all evidence seized pursuant to the search warrant on the grounds that the supporting affidavit did not state probable cause, the warrant did not adequately

describe the place to be searched, and the warrant was not signed by a proper magistrate. Appellant also moved to suppress his statements to the police on the ground that they were not taken in compliance with the code of criminal procedure. *See* Tex. Code Crim. Proc. Ann. art. 38.22 (West 2005). The motions were heard and overruled by the trial court prior to trial. Appellant now contends that the motions should have been granted because of the unlawful conduct of the police during the execution of the search and arrest warrants.

Overstreet was the only witness at the suppression hearing. As is pertinent to appellant's claim, she testified that when she and three other officers arrived at appellant's residence to execute the warrants, appellant's van was parked in the driveway and they could hear loud music coming from inside the house. The officers knocked on the door and windows but there was no response. Overstreet testified that another officer opened the garage door (Overstreet did not know how) and the officers entered appellant's house through a door from the garage. They found appellant on his bed.

Era Marion, one of the officers with Overstreet when the warrants were executed, testified at appellant's trial. She said that after the officers were unable to rouse appellant, she used a "slim jim" tool to unlock the door of appellant's van. She then reached inside and pressed the button on the garage door opener to gain access to the garage. Following Marion's testimony, appellant objected to the admission of the DNA test results on the ground that the samples taken from him were "illegally obtained by reason of the breaking into [appellant's] vehicle without any proper legal authority to do so to enter his home illegally."

Appellant now contends that the trial court should have granted his motions to suppress because the officers unlawfully entered his locked car. Appellant asserts that this unlawful

act tainted all of the evidence seized from his person and his house as well as the statements he made to the police following his arrest. He relies on the statutory exclusionary rule that prohibits the admission of evidence obtained by an officer in violation of the law. *See id*. art. 38.23(a).

The contention appellant raises in this issue was not asserted in his motions to suppress or argued by appellant at the suppression hearing. The evidence on which he relies was not adduced at that hearing, but at the trial itself. The only objection made by appellant on the ground he now asserts was the trial objection to the DNA test results.

Appellant's argument fails on the merits in any case. Appellant asserts that Marion, by opening the locked door of his vehicle, was guilty of burglary of a vehicle. *See* Tex. Penal Code Ann. § 30.04 (West Supp. 2007). To be guilty of this offense, however, a person must break into or enter a vehicle with the intent to commit a felony or theft. *Id*. § 30.04(a). There is no evidence that Marion had such an intent. Appellant also suggests that Marion was guilty of criminal trespass. *Id*. § 30.05. To be guilty of this offense, a person must intrude her entire body into the vehicle. *Id*. § 30.05(a), (b)(1). Marion testified that she reached into appellant's van to push the remote control button, but there is no evidence that her entire body entered the vehicle. Appellant's contention that Marion committed a burglary or a criminal trespass when she unlocked his van to open the garage door is without merit.

Under this same issue, appellant urges that the trial court should have instructed the jurors to disregard the evidence in question if they believed it was obtained in violation of the law. *See* Tex. Code Crim. Proc. Ann. art. 38.23(a). An article 38.23 instruction is required only when there is a factual dispute. *Madden v. State*, 242 S.W.3d 504, 509-10 (Tex. Crim. App. 2007). The pertinent fact, that Marion unlocked appellant's van, was not disputed. No instruction was required.

11

Issue one is overruled.

## PROSECUTORIAL ARGUMENT

This issue revolves around appellant's wrist watch, which was found by the police on the floor of the complainant's bedroom. The complainant testified that she saw the watch on her night stand following the assault. She said that she picked up the watch and threw it to the floor in anger. Later, at the hospital, the complainant told Overstreet that appellant's watch was on her bedroom floor. The watch was recovered by the police and submitted for testing. A mixture of appellant's DNA and the complainant's DNA was found on the watch.

During her own testimony, Overstreet was asked by the prosecutor if she ever questioned appellant about how his watch came to be in the bedroom. Appellant objected to the question and a hearing was held outside the jury's presence. At this hearing, Overstreet said that she asked appellant about the watch at the police station following his arrest and that he responded by saying that he did not have a watch.[2] The trial court ruled that this statement was inadmissible because it was the product of custodial interrogation and had not been recorded or reduced to writing as required by statute. *See* Tex. Code Crim. Proc. Ann. art. 38.22. The prosecutor acknowledged that this ruling was correct and apologized to the court for having raised the subject.

The prosecutor turned to the subject of the watch while cross-examining appellant:

Q. In fact, you told Aimee Overstreet you never had a watch, right?

A. No, ma'am, I never said that.

---

[2] It was for this reason that Overstreet had the watch tested for DNA.

12

Q. When she said on the stand that you talk about you didn't have a watch, she wasn't telling—

Defense counsel objected, arguing at the bench that the prosecutor was going outside the record. The trial court agreed with counsel that Overstreet never testified (before the jury) that appellant denied having a watch. The prosecutor disagreed and asserted, inaccurately, that "Aimee testified about what he said about the watch." The court made no ruling on counsel's objection and the prosecutor continued her questioning without further objection:

Q. Tell us about your watch. That never came up with any of the law enforcement officers?

A. Did it ever come up?

Q. Um-hum, about whether or not you had a watch?

A. I believe it came up after I was already in jail.

Q. Tell us about that. What came up about your watch?

A. They asked me if I was wearing my watch when I went to jail.

Q. And were you?

A. No, ma'am.

. . .

Q. It was at [the complainant's] house, wasn't it?

A. I believe that's where I left it on her hot tub, yes.

Q. In truth you left it on her bed stand, didn't you?

A. No, ma'am.

Q. Now, do you remember at any time telling them that wasn't your watch?

13

A. Excuse me.

Q. Do you remember at any time telling them that wasn't your watch?

A. No, ma'am.

Q. Did you hear Aimee Overstreet talk about the fact that later, not when she first sent samples to be tested at the DNA to see if your DNA was wherever and [the complainant's] DNA was wherever, did you remember that the watch wasn't tested at that time?

A. Yes, ma'am.

Q. And you know, in fact, that later it was tested, correct?

A. Yes, I heard about that.

Q. And you know that you had told them you didn't have a watch there, correct?

A. No, ma'am. I never told them that.

Q. And once your DNA was on it, of course, we all knew it was your watch, correct?

A. I knew it was my watch from the beginning.

The prosecutor also raised the subject of appellant's watch and his denial of ownership during her jury argument:

And I want y'all to remember something that's so important. Do you remember when I was asking him about the watch? And he said, oh—or I'll ask you to remember. Basically I think he was trying to say he didn't really remember if he had one or not then at the time, but he sure didn't mention it [to] the officers. Well he did and then he said, I don't have a watch, that wasn't my watch, I wasn't even in the bedroom. So later that watch was sent—

Defense counsel objected that the prosecutor was outside the record. The court replied that "[t]he jury will recall the evidence." The prosecutor continued:

14

Thank you. Remember the DNA, obviously, [the lab technician], she talked about how she looked at all the evidence. That was his penile swab, his penis ring, all of that evidence and then later, about six months later, Aimee and she talk and she looked at the watch and she did DNA. Why else would we do DNA? Because we had to prove it was his watch.

The prosecutor went on to other subjects, but returned to the watch near the conclusion of her argument:

The victim knew about the watch. The defendant knew about the watch. Now we all know about it because we had to send [it] off to be able to say, oh, yeah, it is your watch.

Appellant's issue on appeal complains solely of the prosecutor's jury argument, and in particular of the prosecutor's statement to the jury that appellant initially denied having a watch. This fact was not in evidence before the jury, and the prosecutor's statement was improper. Appellant did not, however, pursue his objection to an adverse ruling, and he thus forfeited his right to complain about the argument on appeal. *See Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996). Issue four is overruled.

## INEFFECTIVE ASSISTANCE

In his last issue on appeal, appellant urges that his trial counsel rendered ineffective assistance. To prevail on this claim, appellant must show that his attorney made such serious errors that he was not functioning effectively as counsel and that these errors prejudiced appellant's defense to such a degree that he was deprived of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Hernandez v. State*, 988 S.W.2d 770, 771-72 (Tex. Crim. App. 1999); *Hernandez v. State*,

15

726 S.W.2d 53, 57 (Tex. Crim. App. 1986). We must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). To overcome this presumption, any allegation of ineffectiveness must be firmly founded in the record and the record must affirmatively demonstrate the alleged ineffectiveness. *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001).

Appellant complains that after adducing testimony that the police unlawfully opened his vehicle while executing the search and arrest warrants, his attorney failed to pursue this as a ground for suppression at the pretrial suppression hearing. In fact, the evidence to which appellant refers (Marion's testimony) was adduced at trial, not at the suppression hearing, and counsel did thereafter make an objection.

Appellant asserts that his attorney "became visibly upset" when the complainant "chang[ed] her story at the last minute when asked how the watch was found." This is a reference to the complainant's testimony that she found appellant's watch on her night stand and threw it to the floor. When the complainant said this during questioning by the prosecutor, defense counsel interrupted to say, "Wait a minute. Do I understand your testimony—." He immediately apologized to the court for speaking out of turn, but later he vigorously cross-examined the complainant on this point. During this cross-examination, the complainant acknowledged that she had never mentioned this particular fact in any of her statements to the police. Counsel also challenged the truth of this statement, urging that in fact the complainant had found the watch by the hot tub, where appellant said he left it, and that she had moved it to the bedroom to incriminate him.

16

Finally, appellant urges that his attorney did not preserve error with respect to the prosecutor's repeated attempts to place before the jury appellant's inadmissible statement to Overstreet denying ownership of the watch. As noted above, defense counsel successfully objected to this testimony and obtained a ruling that appellant's statement to the officer was inadmissible. When the prosecutor referred to the inadmissible statement to Overstreet during her cross-examination of appellant, counsel objected that she was outside the record and obtained a favorable ruling from the court. But when the prosecutor again referred to this inadmissible statement during her jury argument, defense counsel did not ask for an instruction to disregard or otherwise pursue his objection to an adverse ruling.

This trial took five days, one to select the jury and four for the testimony, argument, and jury verdicts. Defense counsel thoroughly cross-examined the State's witnesses and clearly presented a viable defensive theory, which counsel was careful to show was consistent with the physical evidence. Although counsel did not ask that the jury be instructed to disregard the prosecutor's improper jury argument, we do not believe that this error warrants a finding that counsel did not function effectively during the trial. Moreover, the jurors knew that the watch was tested for DNA, and they were likely to have inferred from this that there had been some question as to ownership prior to trial. Under the circumstances, the absence of an instruction to disregard did not prejudice the defense to such a degree that appellant was denied a fair trial.[3] Issue five is overruled.

---

[3] In his brief, appellant also states that trial counsel "failed to obtain an evidentiary hearing on [his] motion for new trial." The record reflects that the trial court overruled the motion without a hearing, and appellant does not now assert that this action was error.

17

The district court's judgment is modified to state that the defendant's name is Charlie Deherrera, III. As modified, the judgment is affirmed.

_____

Diane M. Henson, Justice

Before Chief Justice Law, Justices Waldrop and Henson

Modified and, as Modified, Affirmed

Filed: August 1, 2008

Do Not Publish