**Opinion issued April 30, 2013**



In The

# Court of Appeals

For The

# First District of Texas

———————————————

## NO. 01-11-00771-CR

———————————————

**FRONSHUA RAMONE WASHINGTON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 182nd District Court**
**Harris County, Texas**
**Trial Court Case No. 1245423**

---

## MEMORANDUM OPINION

A jury convicted Fronshua Ramone Washington of aggravated robbery and assessed his punishment at confinement for life, plus a $10,000 fine. On appeal, Washington contends that (1) comments made by the prosecutor during the State's

closing argument for the punishment stage of trial were improper and affected his substantial rights, and (2) the trial court erred by allowing the State to question a witness about the contents of a document not admitted into evidence.

We affirm.

## Background

Washington was convicted of robbing a game room security guard at gunpoint, along with three other co-defendants. He is not challenging any aspect of the guilt/innocence phase of his trial.

During the punishment phase of Washington's trial, the jury learned that Washington was on community supervision for another robbery when he and his co-defendants robbed the security guard. A probation officer testified that Washington had difficulty complying with the terms of his community supervision (i.e., failing to provide proof of employment, getting kicked out of a court-ordered residential program for fighting, failing to complete his community service). Despite multiple opportunities to do so, the court declined to revoke his community supervision—at least until Washington was charged with aggravated robbery in the present case. At that point, the court heard the State's motion to

adjudicate, granted the motion and assessed Washington the maximum punishment—twenty years' confinement.[1]

The jury also heard from J. Williams, an acquaintance of Washington's, who testified that she overheard Washington and his friends planning robberies and discussing ones that they had committed, including robberies involving game rooms. Williams identified Washington and his hand tattoos from photos printed from Washington's MySpace page. She also testified that Washington and his group of friends "ran" the apartment complex where she lived. According to Williams, the majority of the apartment complex's residents were afraid of Washington, who claimed to be a member of the 5-Deuce Hoover Crips and was known to carry a gun.

Williams testified that on one occasion, she saw Washington in her friend's apartment supervising the counting of a table "full of money" with a "money machine." When that apartment was subsequently raided, Washington had one of his friends give Williams a bag to hold for him, which contained a handgun and a "money machine." When Williams called Washington to confront him about the bag, he told her that the contents were "hot" and instructed her to just hold it and he would be by later to retrieve it. Williams turned the bag into the police.

---

[1] The security guard and the complainant in Washington's previous robbery also testified during the punishment phase.

Finally, the State called Deputy M. Squyres with the Harris County Sheriff's Office. During a hearing outside the pretense of the jury, Deputy Squyres testified that he had worked in the Gang Suppression Unit for seventeen-years. At the request of the prosecutor, Deputy Squyres met with Washington one-week before trial in order to determine whether Washington was affiliated with any gangs.[2]

Deputy Squires testified that after he met with Washington, he located Washington's MySpace page, which contained several photos and other information. When the State offered a printout of the MySpace page into evidence (State's Exhibit 37), Washington objected on the basis of authentication (i.e., there was no way to know if the page actually belonged to Washington or if he made any of the comments or uploaded any of the photos associated with it). Ultimately, the State withdrew its offer of Exhibit 37, and, instead, offered into evidence four photos associated with the MySpace page, all of which were admitted without objection (State's Exhibits 43-A, B, C and D). Exhibit 43-A is a photo of a t-shirt with the numbers "5" and "2" with an upright pitch fork with the word "Hoover" across the bottom. Exhibit 43-B is a photo of the tops of a man's tattooed hands. Exhibit 43-C is a photo of Washington and 43-D is a photo of an automatic pistol.

---

[2] Washington's attorney was not informed of the meeting and objected to any statement Washington allegedly made during his interview with Deputy Squyres as a violation of his right to counsel. The court indicated that Squyres testimony should be limited to what he observed and should not relate back anything Washington may have said to Squyres.

During his interview with Washington, Deputy Squyres observed that the tops of Washington's hands were tattooed with the number 503 tattooed on one hand and the initials M-O-B tattooed on the other, just like in the photo from the MySpace page (State's Exhibit 43-B). According to Squyres, the tattoos indicated to him that Washington was a member of the 503 Manner Mob gang. Deputy Squyres identified Washington from another photo associated with the MySpace page (Exhibit 43-C). He also testified that the signs, symbols and colors on the t-shirt in Exhibit 43-A were all associated with the 5-Deuce Hoover Crips, a dangerous gang originally out of California that was either the second or third largest gang in Harris County.

The State then asked Deputy Squyres about statements he observed on the MySpace page. Washington objected "to [Squyres] reading from something that has not been admitted into evidence." The objection was overruled. Deputy Squyres read some of the contents of the printout out loud for the jury, including the following:

> What is it cuz. It's me, Fronshua, coming at 6' 3", 225 pounds, out that 503 Homestead, Texas, northeast side, rippin the 5-Deuce Hoova under the three-point crown. No set tripping. I still hold My's down.

Deputy Squyres testified that this is "Crip-type speech or writing" and that the "5-2 Hoovar" represented the 5-Deuce Hoover Crips and the "three-point crown" represented a symbol with which the Crips identify. He also testified that

5

Washington listed Tookie Williams, a cofounder of the original Crips, as a person he would like to meet. Deputy Squyres testified that in his opinion, Washington was a member of the 5-Deuce Hoover Crips.

Washington gave his closing argument first and asked the jury to access his punishment at 15 years; a sentence that Washington argued would not only serve as punishment, but also allow him a chance at rehabilitation. The State summarized the evidence and responded to Washington's plea for a chance at rehabilitation with the following argument:

> What about his probation? So, the Judge gives him a chance. He messes it up. And then there's this amazing program, Young Men About Change. No. This defendant's a young man against change. That's what he is. Doesn't care. He's fighting other kids in there. And who do you think's going to win? He is enormous. He is a big guy. I do not want to see him out anywhere. So, then they give him some jail time. Maybe that will fix him. He doesn't want to be involved in the program. Doesn't want the help. And then he messes up again. Doesn't bother to get a job like the rest of us. He doesn't care. He'll find a way to hit a lick and get money. . . . Judge Barr maxed him at 20 on the adjudication hearing. What does that tell you? Do not let him out. Do not let him back into our community. That's y'all's decision. Usually we always ask y'all for a number or we say "Don't give him less than this." I personally— I wouldn't ever let him out.

Washington did not object to any portion of the prosecutor's closing argument.

## Discussion

## A.     Improper Jury Arguments

In his first issue, Washington argues that the prosecutor made two improper comments during the State's closing argument for the punishment phase of trial. Washington argues that his sentence should be vacated and his case remanded for a new trial on punishment because the prosecutor's comments, which were manifestly improper, violated a mandatory statute, and injected new and harmful facts into the case, exceeded the permissible bounds of proper jury argument and affected his substantial rights.   The State responds that Washington failed to preserve this argument for our review because he did not object to the prosecutor's comments during trial.

Washington cites to *McKay v. State*, 707 S.W.2d 23, 36 (Tex. Crim. App. 1985) and *Mathews v. State*, 635 S.W.2d 532, 539 (Tex. Crim. App. 1982) for the proposition that reversible error occurs where, in light of the record as a whole, a jury argument is extreme or manifestly improper, injects new and harmful facts into the case, or violates some mandatory statute.   *McKay*, however, is distinguishable because, unlike in the present case, the defendant objected to the prosecutor's arguments at trial and preserved his improper-jury-argument complaint for appellate review.

Although Washington does not directly address the fact that he did not object during the State's closing argument, his reliance upon *Matthews* indicates that he believes that, given the nature of the comments, no objection was needed to preserve the issue for our review. The Court of Criminal Appeals previously recognized that "jury argument error will not be waived for failure to object where the argument is manifestly improper, or violates some mandatory statute, or injects some new fact harmful to the defendant's case," *Willis v. State*, 785 S.W.2d 378, 385 (Tex. Crim. App. 1989) (citing *Mathews*, 635 S.W.2d at 539)). The court, however, subsequently overruled that exception to the general rule in *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996). *See Estrada v. State*, 313 S.W.3d 274, 303 (Tex. Crim. App. 2010) (citing *Cockrell*, 933 S.W.2d at 89 (holding a "defendant's failure to object to a jury argument . . . forfeits his right to complain about the argument on appeal.")).

In light of *Cockrell* and its progeny, it is now well-settled that absent a timely, specific objection to an improper jury argument, nothing is preserved for review. *See, e.g.*, *Estrada*, 313 S.W.3d at 303; *Wead v. State*, 129 S.W.3d 126, 130 (Tex. Crim. App. 2004); *Cockrell*, 933 S.W.2d at 89. Because Washington did not object to the prosecutor's comments, no error has been preserved for our review. *See* TEX. R. APP. P. 33.

We overrule Washington's first issue.

8

## B. Printouts from MySpace Page

In his second issue, Washington contends that the trial court erred in admitting witness testimony regarding statements Washington allegedly made on his MySpace page and allowing the State to read portions of the MySpace page printout to the jury, even though the document was not admitted into evidence. The State responds that Washington waived this issue, but even if the issue is preserved for our review, Washington cannot prevail because he has not demonstrated that he was harmed by the admission of this testimony.

We review a trial court's decision to admit evidence for an abuse of discretion. *Shuffield v. State*, 189 S.W.3d 782, 793 (Tex. Crim. App. 2006). A trial court abuses its discretion only if its decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008). If the trial court's decision is correct on any theory of law applicable to the case, we will uphold the decision. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009). Furthermore, improper admission of evidence is harmless if the same or similar evidence is admitted without objection at another point in the trial. *Smith v. State*, 236 S.W.3d 282, 300 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (citing *Leday v. State*, 983 S.W. 713, 717 (Tex. Crim. App. 1998)).

9

The crux of Washington's argument is that, although Williams testified that he was a self-proclaimed member of the 5-Deuce Hoover Crips gang, the most dramatic and damaging testimony during the punishment phase was Squyres reading of statements that Washington allegedly made on his MySpace page, which allowed the State to "put 'Crip-type speech or writing' in the mouth of [Washington], and to do so through a witness that carried the force of a law enforcement officer and gang expert." According to Washington, Deputy Squyres testimony about this document, which was never admitted into evidence, greatly enhanced Washington's dangerousness in the eyes of the jury assessing his punishment.

Even if the court erred by allowing Deputy Squyres to testify about the contents of a document not admitted into evidence, the error was harmless, given the admission of other similar evidence without objection. *Smith*, 236 S.W.3d at 300. Williams testified that Washington was a self-proclaimed member of the 5-Deuce Hoover Crips who "ran" her apartment complex and regularly carried a gun. According to Williams, most of the complex's residents were afraid of Washington. More importantly, when asked about the photographs taken from the MySpace page, which were admitted without objection, Deputy Squyres identified Washington from one of the photos and testified that the signs, symbols, and colors on a t-shirt in another photo were all associated with the 5-Deuce Hoover Crips, a

10

dangerous gang originally out of California that was now one of the largest gangs in the county. Thus, evidence of Washington's affiliation with a large, dangerous gang—the 5-Deuce Hoover Crips—and his dangerous reputation (i.e., the majority of the people living in the apartment complex he "ran" were afraid of him) were already before the jury.

We overrule Washington's second issue.

## Conclusion

We affirm the judgment of the trial court.

## PER CURIAM

Panel consists of Justices Jennings, Higley, and Sharp.

Do not publish. TEX. R. APP. P. 47.2(b).

11