

NUMBER 13-13-00699-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

KERSTIN PREIS JONES,                                                          **Appellant,**

**v.**

THE STATE OF TEXAS,                                                          **Appellee.**

On appeal from the 377th District Court of
Victoria County, Texas.

# MEMORANDUM OPINION

**Before Justices Rodriguez, Garza and Benavides
Memorandum Opinion by Justice Garza**

A Victoria County jury convicted appellant, Kerstin Preis Jones, of the first-degree

felonies of solicitation of capital murder and unlawful delivery of a controlled substance in

penalty group 1, namely oxycodone, in an amount of more than 200 but less than 400

grams. *See* TEX. PENAL CODE ANN. §§ 15.03(a), (d)(1), 19.03 (West, Westlaw through

2013 3d C.S.); TEX. HEALTH & SAFETY CODE ANN. §§ 481.102(3)(A), 48.112(a), (e) (West,

Westlaw through 2013 3d C.S.). The jury assessed punishment at five years' imprisonment for the solicitation offense and ten years' imprisonment for the controlled substance offense. The trial court suspended the ten-year sentence and placed appellant on community supervision for ten years, with that sentence to run consecutively to the five-year prison term. On appeal, Jones alleges she was harmed by inflammatory statements made by the prosecutor. We affirm.

## I. BACKGROUND

Jones, a German national, was accused of attempting to hire an individual to murder Yvette Garcia. Garcia served as a private nurse for Jones's husband, Roderick, and was involved in a sexual relationship with him. The individual that Jones solicited to murder Garcia was a confidential informant working with law enforcement.

At trial, Garcia testified to, among other things, the condition of the Joneses' property in Pleasanton, Texas. Garcia stated that there were many animals at the property and that the property "was like a zoo." When asked what condition the animals were in, Garcia replied: "Poor." She testified in particular that she saw "[m]any thin animals," including two dogs that were so "emaciated" that she "could see their bones." She stated that she had seen news reports on television regarding the poor condition of the animals at the Joneses' property. She stated that she had "seen pictures of dead horses of [Jones's] before."

Roderick testified that he is a wheelchair-bound military veteran. He lived in Pleasanton with Jones until, at some point, he moved to a nursing home in Port Lavaca. When asked why he moved to the nursing home, Roderick replied: "It was for medical needs and to get away from Mrs. Jones." He elaborated:

> Mrs. Jones had accumulated 30 horses and about 20 dogs. These things looked like they were about to die. They were bad. The condition was bad. There was feces all over the place, even inside. She had three or four dogs inside, it was just—it was horrible. I asked her for several years, please, please clean up the place, cut away the dogs and cut away the cows and the horses. She would never do it.

Roderick stated that he met Garcia at the nursing home, but that their relationship did not become sexual in nature until after Garcia quit her job there. He stated he is engaged to Garcia and that they intend to marry after he finalizes his divorce. When he heard that Jones was arrested, he returned to the Pleasanton property. He called animal control and they "came and got" all of the animals off of the property.

Robin Hoffer testified that she had a horse that was "doing poorly" and boarded the horse at Jones's property. She stated: "It was doing good and I was giving her feed money and money [sic] and then all of a sudden people were telling me that her horses are getting fed and mine isn't and it just died."

Marcus Jackson testified that he was friends with Jones and eventually was engaged in a sexual relationship with her. In 2011, he was arrested for delivering cocaine to a confidential informant. In exchange for leniency, he admitted to the offense and pledged to work as a confidential informant for law enforcement. According to Jackson, his activities as police informant led to six indictments, including that of Jones. Jackson stated that he once saw dead animals on Jones's property, and he knew they had died of starvation "[b]ecause you could see every bone in their body." According to Jackson, in response to media attention about the animals' condition, Jones bought "a hundred bales of hay" but "it was for show" and "[t]he animals still didn't have anything to eat, because they couldn't get to it."

Jackson testified that Jones told him that Garcia "pulled a pistol on her." She knew

3

that Garcia was having an affair with Roderick. Jackson stated that Jones complained about Garcia frequently and that she accused Garcia of poisoning her animals. At one point, Jackson and Jones were eating at a restaurant when two male associates of Jackson walked in. Jackson testified that these men are "not, I guess you could say, upstanding citizens." Jones told the men that "she wanted to have somebody taken care of." Jackson said it was "obvious" that Jones meant she wanted the men to harm Garcia. Another time, Jones asked Jackson to plant a large bag of various prescription pills in Garcia's car so that Garcia would be arrested. According to Jackson, Jones "became completely obsessed with taking care of this woman . . . . Ending her life. She wanted her out of the picture completely, never coming back." Jackson reported the threats to police. Later, he wore a concealed microphone to record incriminating statements by Jones.

Investigator Shawn Hallett of the Texas Department of Public Safety ("DPS") testified that Jones hired an undercover officer and provided him with "[a] bag of pills, two thousand dollars in cash and a shotgun." During his investigation, Investigator Hallett interviewed a man who reported having previously sold that particular shotgun. The following colloquy occurred:

| A. [Investigator Hallett] | . . . When we talked to [the seller of the gun] his words to us were that he sold that gun to a wetback. |
| Q. [Prosecutor] | Oh. Well, Mrs. Jones, what is her status? Is she here legally? |
| A. | No, sir. |
| Q. | Okay. Do you know what her nation of origin is? |
| A. | Germany. |

4

Q. Okay. So I guess he's right, she's just a better swimmer than some, right?

Defense counsel objected to this last question as improper, and the trial court sustained the objection.

During closing argument, defense counsel suggested that Victoria County was an improper venue for the trial because "the murder was supposed to happen, if at all, in Calhoun County." Defense counsel further suggested that law enforcement was overstepping its authority:

> So here we are at the end of the trial and the government wants you to convict Mrs. Jones, a fellow human being, no criminal history, on the word of a drug dealer and substandard supervision instructions from the DPS. You know, these days are numerous—there are numerous rumors, the government is spying on us with drones and tapping our phones. Is that America, is that freedom? They sent that drug dealer, Marcus Jackson, wired into her private life. He was able to pick and choose which conversations he wanted to record, which conversations he wanted you to hear, and they expect us to believe there wasn't more going on behind the scenes? If they're allowed to do this, then what's next, who's next? Where do we draw the line?

In his closing argument, the prosecutor attempted to rebut defense counsel's suggestions of improper police conduct by stating:

> This isn't some faraway place, these are local officers, these are the kids whose wives teach your children. They're the ones that eat where you eat, they live in your neighborhood. It's not some wicked faraway gestapo troopers who march and who step up and down up on the burrough somewhere, these are your neighbors.

Defense counsel made no objection to this statement.

Later in his closing argument, the prosecutor stated that Jones's ranch was "kind of like a freaking Auschwitz for horses and donkeys. . . . It's a place animals go to die." Defense counsel objected to this statement as inappropriate and stated: "Just because

5

my client's German does not give the district attorney a right to associate her with Nazi Germany." The trial court overruled the objection. Defense counsel later moved for a mistrial based on this statement, and the trial court overruled that as well.

Jones was convicted as charged and this appeal followed.

## II. DISCUSSION

### A. Standard of Review and Applicable Law

Permissible jury argument falls into four distinct and limited categories: (1) summary of the evidence; (2) reasonable deductions from the evidence; (3) response to opposing counsel's argument; or (4) plea for law enforcement. *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008). An improper argument does not constitute reversible error unless "the argument is extreme or manifestly improper, violative of a mandatory statute, or injects new facts harmful to the accused into the trial proceeding." *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000). "In determining whether jury argument is extreme or manifestly improper, we look at the entire record of final arguments to determine if there was a willful and calculated effort on the part of the State to deprive appellant of a fair and impartial trial." *Brown*, 270 S.W.3d at 573 n.3.

A defendant's failure to object to a jury argument forfeits his right to complain about the argument on appeal. *Estrada v. State*, 313 S.W.3d 274, 303 (Tex. Crim. App. 2010); *see Cook v. State*, 858 S.W.2d 467, 473 (Tex. Crim. App. 1993) ("In order to preserve jury argument error for appellate review, the defendant must (1) make an objection; (2) request an instruction to disregard; and (3) make a motion for a mistrial.").

6

**B.      Analysis**

By her sole issue on appeal, Jones contends that the prosecutor made "inflammatory statements causing harmful error."  In particular, Jones complains of:  (1) the prosecutor's "references to appellant as a 'wetback'"; (2) the prosecutor's reference to "wicked faraway gestapo troopers"; and (3) the prosecutor's statement that Jones's ranch was "like a freaking Auschwitz."

First, with respect to the "wetback" remark, we note that the prosecutor did not utter this word; rather, the prosecutor was merely referring to Investigator Hallett's testimony regarding what the seller of the gun told him about the purchaser of the gun. The prosecutor then stated:  "I guess he's right, she's just a better swimmer than some." The trial court sustained defense counsel's objection to the statement.[1]  Jones has preserved no issue for our review as to this statement because the trial court never made an adverse ruling.  *See Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007) (noting that, to preserve error in prosecutorial argument, a defendant must pursue his objections to an adverse ruling); *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996) (same).

Second, as to the prosecutor's "wicked faraway gestapo troopers" comment, Jones has likewise failed to preserve any issue for appellate review because defense counsel made no objection.  *See* TEX. R. APP. P. 33.1(a)(2) (providing that, "[a]s a prerequisite to presenting a complaint for appellate review, the record must show that . . . the complaint

---

[1] Defense counsel made no request for an instruction to disregard or for a mistrial with respect to this comment.

was made to the trial court by a timely request, objection, or motion . . ."); *Estrada*, 313 S.W.3d at 303; *Cockrell*, 933 S.W.2d at 89.

Finally, we address the prosecutor's comment that Jones's ranch was "like a freaking Auschwitz for horses and donkeys." Jones argues that this comment was highly inflammatory and linked her to the "horrific, well-documented, Nazi past" of her native country. The State contends that it was an accurate summation of the evidence and downplays the prejudicial effect of the reference.[2]

Assuming, but not deciding, that the statement constituted misconduct and that the trial court erred in overruling defense counsel's objection, we nevertheless find that the error is not reversible. Error of this type is non-constitutional in nature, *Brown*, 270 S.W.3d at 572, and non-constitutional error "that does not affect substantial rights must be disregarded." TEX. R. APP. P. 44.2(b). To determine whether Jones's substantial rights were affected, "we balance the severity of the misconduct (i.e., the prejudicial effect), any curative measures, and the certainty of conviction absent the misconduct." *Brown*, 270 S.W.3d at 573. Here, the prejudicial effect of the statement may have been considerable and there was no curative measure, such as an instruction to disregard, requested by defense counsel or provided by the court. However, the evidence establishing Jones's guilt was substantial and overwhelming.[3] In particular, DPS Agent Jose Ramirez testified

---

[2] The State argues in its brief that "there is simply no wellspring of anti-German prejudice in the American psyche. We might bear some resentment to the Germans for beating us at the World Cup recently, but that is pretty much it as far as anti-German feeling goes in this country today." We note that, though this may be true, there is certainly a well-deserved "wellspring" of anti-*Nazi* prejudice in this country, and it is the reference to the Nazi regime, not the nation of Germany generally, that Jones objects to here.

[3] The State does not address "the certainty of conviction absent the misconduct" in its brief. *See Brown v. State*, 270 S.W.3d 564, 573 (Tex. Crim. App. 2008). Instead, it bases its harmless-error argument on the fact that the jury assessed punishment near the minimum permissible upon conviction of a first-degree felony. *See* TEX. PENAL CODE ANN. § 12.32(a) (West, Westlaw through 2013 3d C.S.) (providing that a person convicted of a first-degree felony shall be punished by imprisonment "for life or for any term

that he was involved in this case as an undercover officer and that he arranged to meet Jones behind an abandoned building in Victoria. At the meeting, Jones gave him $2,000 in cash, a bag of pills, a shotgun, and two photographs depicting Garcia and her residence. Jones asked Agent Ramirez to "make [Garcia] dead." A DPS lab supervisor testified that the pills included 134.56 grams of oxycodone.[4] The primary defensive strategy appears to have been centered on impugning Jackson's credibility.

In light of the entire record, we find that Jones's conviction was extremely likely even absent the presumed misconduct, and that this likelihood of conviction outweighs the prejudicial effect of the misconduct and the lack of a curative instruction. *See id.* Therefore, any error is harmless.

We overrule Jones's sole issue on appeal.

### III. CONCLUSION

The trial court's judgment is affirmed.

DORI CONTRERAS GARZA,
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
28th day of August, 2014.

---

of not more than 99 years or less than 5 years").

[4] The DPS lab supervisor testified that the total weight of the pills that Jones delivered to Agent Ramirez was 607.06 grams, 134.56 grams of which were oxycodone. The jury convicted Jones of delivering more than 200 but less than 400 grams of oxycodone. The discrepancy is not addressed on appeal.

9